O. C. MORTRUDE, Appellee, v. JAMES P. MARTIN et al.,
Appellants.

NEGLIGENCE: Landlord and Tenant—Injuries of Employee of Ten-
1   ant—Sufficiency of Evidence. Evidence reviewed, and held suffi-
cient to present a jury question, and to sustain a verdict, on the
ground that the defendants were negligent in permitting water
to leak from the ceiling, where an employee of the tenant was
injured by the fall of plaster from the ceiling, during construc-
tion work being carried on above by the landlord.

PRINCIPAL AND AGENT: Liability of Principal—Negligence of
2   Architect and Engineer. The owner of a building is liable for
the negligence of his architect and engineer while the latter is
acting within the scope of his employment in constructing the
building.

TRIAL: Verdict—Form—Joint Defendants. There was no error in
3   not submitting separate forms of verdict as to the defendants
where, under the evidence, if there was any liability, both de-
fendants joined in the action would be liable.

NEGLIGENCE: Landlord and Tenant—Injuries to Tenant—Con-
4   tributory Negligence—Sufficiency of Evidence. Evidence re-
viewed, and held a question for the jury as to whether the em-
ployee of a tenant, injured by being struck with a piece of

plaster falling from the ceiling, was guilty of contributory negligence.

NEGLIGENCE: Landlord and Tenant—Construction of Lease—Damages from Dangerous Condition. A provision in a lease whereby the tenant waived claims for damages from the construction of an additional story to a building referred only to damages received from proper construction, and did not cover damages for negligence in constructing the additional story, and did not release the landlord from his acts in creating a dangerous condition.

TRIAL: Examination of Juror—Association with Insurance Company—Discretion of Court—Harmless Error. The trial court is within its discretion, in a personal injury case, in allowing prospective jurors to be examined in regard to their being associated with insurance companies insuring against personal injuries; and where objection to the question was sustained, there was no prejudice.

TRIAL: Instructions—Applicability to Evidence—Instructions Taken as a Whole. In an action for injuries caused by the fall of plaster from the ceiling, instruction as to the pouring of concrete and water held not objectionable as to the use of the word "water" when only concrete was poured, when taken in connection with the other instructions.

TRIAL: Verdict—Excessiveness—Personal Injury. Evidence reviewed, and held that a verdict for $7,500 was not excessive, where a fracture of the skull had been received, causing intercranial hemorrhages and intense suffering to a 36-year old man, who had not recovered at the time of the trial, 8 months after the injury, and whose memory was bad, and who could not keep books as well as before the injury, and when there was a possibility that the injuries might result in epilepsy or insanity.

*Appeal from Woodbury District Court.*—GEORGE JEPSON, Judge.

MAY 6, 1919.

THIS is an action at law, in which the plaintiff seeks to recover damages for personal injury received by him on May 11, 1916, said injuries having been caused by the falling of plastering from the ceiling of the store in which plaintiff was employed. Plaintiff was struck on the head

by the falling plastering. He claims that his skull was fractured, and that there were internal hemorrhages, and permanent injuries. There was a trial to a jury, and a verdict and judgment for plaintiff for $7,500. The defendants appeal.—*Affirmed.*

*Robert H. Munger,* and *Sears, Snyder & Boughn,* for appellants.

*O. D. Nickle,* and *Henderson & Fribourg,* for appellee.

PRESTON, J.—1. The defendant Martin is the owner of the building known in the record as the Frances building, and defendants Stevens & Company, as architects and engineers, were employed by Mr. Martin to superintend and supervise the construction of the building. They did the work on the commission plan. Defendants commenced the construction of the building in 1914, but at that time, the first story only was constructed. That story was completed, and the furnished store rooms were rented by defendant Martin. One of these rooms was leased to the Gately-McIntyre Company, which occupied the storeroom as a retail clothing store. Plaintiff was employed in the store. He went to work for the Gately Company six or seven weeks before he was hurt, at which time the canopy was up, and plaintiff knew that the construction work was going on above, and that it was concrete construction work; he knew, also, that the Gately Company was a tenant. The lease provided that the tenant should pay for repairs of all kinds, in connection with said leased premises, and that the owner might, at any time, build the building higher, without the consent of the party of the second part, and without any claim from it.

Plaintiff was injured by falling plastering from the ceiling of the storeroom, caused, as plaintiff alleges, by the negligence of the defendants in allowing water to pass

from above to the storeroom ceiling. Four grounds of negligence were charged in the petition; but under the evidence and the law, the trial court was of opinion that but one ground should be submitted to the jury, and that was whether defendants were negligent in permitting water and concrete to be poured on the floor or floors above the Gately-McIntyre store, causing the ceiling in the store building occupied by said company to fall. Answering separately, defendants deny generally, but admit the corporate capacity of Stevens & Company, the ownership in Martin, and the leasing of the premises, and allege that the construction work of enlarging the building was done with the full knowledge and consent of the tenant; that the entire building was constructed in conformity to plans and specifications prepared and approved by competent architects and engineers; that defendant had no knowledge of any defect or weakness in the ceiling and plastering, and any defects which may have existed were latent, invisible, and unknown defects; that the same were inspected and approved by competent inspectors. They deny that they ever directed or caused any water and concrete to be poured upon the ceiling of said storeroom, or any floor of which said ceiling was a part. Defendant Stevens & Company further says that it did not construct the ceiling and plastering complained of, and was in no way responsible for defects therein.

We do not understand either party to now claim that the ceiling and plastering were improperly constructed, or that improper material was used. The question is as to whether defendants caused or permitted water to impair the plastering, after it was constructed, and during the construction of the floors above.

The building was completed as a one-story building in 1914, and leased to the Gately Company in February,

1915. The construction work for enlarging the building was commenced about the middle of March, 1915, and it was completed as an eight-story building in 1916. Plaintiff was injured on May 11, 1916, at which time the forms were being finished on the roof above the eighth story, and there were six concrete floor slabs above the Gately store, and all forms had been removed, except in the seventh and eighth stories. There is evidence that, at that time, the concrete below the two top stories had set, and was hard, and there was no dripping of water from them. It appears from undisputed evidence, or the jury could have found, upon conflicting evidence, the following state of facts: That there was no written contract between the owner, Martin, and Stevens & Company, who were erecting the building for Martin. Stevens & Company furnished the superintendent, Stevenson, who had the selection of all the material, with the confirmation and approval of the defendant Martin. Stevenson had full charge, as superintendent of construction. He was a civil engineer, and there is evidence tending to show that he was a competent superintendent. They also supervised the labor. Martin furnished the money and paid off the labor, and contracts with other parties were let, with the confirmation and approval of Martin. Stevens & Company were acting as supervising architects for Martin, and represented him in all matters pertaining to the building. The arrangements between them were practically the same as between them for the erection of what is known as the Martin Hotel, a case which has been in this court, and is referred to in the argument.

The structural framework of the building in question, is reinforced concrete, a combination of steel rods with concrete, the last being a mixture of rock, sand, and cement. The first construction work above was to build a protection around the building over the sidewalk, and extending over

the entrance to the Gately store; then the false roof, which had been constructed over the first story, was opened. This false roof was about two to three feet above the second floor of the building, at the point above the room occupied by the Gately Company, and where the plastering fell. In these openings, the forms for the columns, reaching to the third floor of the building, were placed. The forms on the second floor were about 11½ or 12 feet long, and were constructed of rough pine, or hemlock, 6-inch boards, of lumber called stock lumber, set edge to edge, and not matched. For a 24-inch column, about a 36-inch hole would be cut in the false roof. The wooden forms were placed over the steel rods that came from the lower floor, over the Gately store; the form work was built first; then the steel rods were placed and wet concrete deposited; and, when the concrete was sufficiently hardened, the form work was removed, and that operation continued. The columns were constructed about the same way. After the forms were set down in, the false roof was carried over against the columns, and was flashed with tar paper and pitch. The object in the flashing and the joining of the false roof to the columns was to keep the water from getting through onto the floor. It seems to be established that proper precautions were taken by defendants to prevent water from reaching the ceiling, from storms, steam drip, and in other ways and places than through the forms over the Gately store; and as to these, defendant's evidence tends to show that the forms were properly caulked, so that they were water-tight, both above the flashing and below the flashing, between the false roof and the ceiling below; but plaintiff's evidence is contrary to this.

As we view it, this is the turning point in the case, appellants contending that the evidence was insufficient to take this question to the jury, while the plaintiff contends that the evidence was ample. This fact question as to

whether there was sufficient evidence of defendants' negligence is the one most elaborately argued and most seriously relied upon for a reversal. There is evidence tending to show that plastering sometimes falls without any known reason therefor. As said, appellants' evidence tends to show that the forms were properly caulked, and there was evidence by witnesses for defendants that frequent inspections were made, and that no leakage was discovered, and that, after the accident, when the rest of the plastering was taken off the ceiling, on the first floor, it could not be determined what was the cause of the falling of the plastering which injured plaintiff. We shall not set out the testimony for appellants, nor that of plaintiff in too much detail; but enough of plaintiff's evidence will be stated to show that, even though contradicted by defendants' testimony, the evidence was sufficient to take the case to the jury on the question of defendants' negligence.

The testimony for plaintiff is to the effect that some of the forms were made on the canopy over the sidewalk, and some on a vacant lot near by. A witness testified that he saw these forms erected there, and that they were stuffed with oakum, down at the bottom, just around the bottom.

"Q. What was done, if anything, as to stopping the cracks between the boards, and up and down the cracks of the columns? A. Nothing, that I know of. I saw the forms erected there. Q. When you helped set these columns on the east side, were they caulked at the time you set them up, in the cracks between the boards,—did they have any oakum or anything between them? A. No, sir."

There is evidence that, when the columns of the second floor were poured, the third floor forms were up, and the concrete was poured off the level of the third floor, into the column forms of the second floor; that, unless these forms were absolutely tight, there would be a volume of water flowing away from the cement when it was poured,—

that there always is in concrete work; that, when concrete was poured into these forms, water would escape from the bottom of the forms, up to where it was protected by the flashing, and would go out through the cracks and wet the floor, and water from above the flashing would follow the columns down when they filled the columns, and the beams of the floor above. If water got on the concrete floor, it would go through to the ceiling, and would have a tendency to destroy the plastering; it would weaken the bond and destroy its adhesion, and the ultimate tendency would be to make it come off. It would not necessarily fall at the time of being wet. The plastering, such as that which fell, would absorb water, the amount depending upon its age. These facts were known to Stevenson, the superintendent of construction. There was no difference in the construction of the forms below the false roof and above it. Quite a lot of water escaped through the cracks above the false roof. Prior to the accident, different parts of the ceiling of the Gately store were damp and wet. Dampness and gravel fell from this ceiling on the adding machine in the office, so it would have to be moved. This adding machine sat alongside the column near which this plastering fell.

The plastering that fell and injured plaintiff was an irregularly shaped piece, averaging five or six feet square. After the accident, defendants immediately ordered the plastering taken off all the ceiling of the other first floor stores, as a precaution that similar accidents should not happen elsewhere. In taking it off, the plastering was found loose at different places, in spots from a foot to two or three feet square. Pinch bars and hammers were used to take the plastering down. To discover the loose places, a hammer was used, and if it was loose, it would sound like hitting a drum. There is no evidence for defendants, as we understand the record, that the forms were caulked prior to the time they were erected, or as to the placing of

the flashing. Their evidence is that the caulking was done from the inside of the forms; while another witness for defendant says that some of the caulking was done from the inside of the forms, and some of it by creeping underneath the false roof. Appellee contends that the physical facts are such that, under the condition described, the forms could not be properly caulked in the manner described, the forms being but two feet square; and that it is unreasonable to assume that defendants would caulk the forms under such conditions, when they could easily have been caulked before they were erected. Evidence for plaintiff shows that the ceiling on the whole first floor of the Frances building was furnished in the same manner, and of the same material as the ceiling of the Gately store; that all the columns on the second floor were erected of the same material, and in the same manner; that water did come through the floor slabs, and to the ceiling of the first floor. The superintendent of construction knew that, if water got on the floor above, it would soak through; and the superintendent says, on cross-examination, that, if water did get through the ceiling, he would take that into consideration in determining the cause of the ceiling's falling at the time plaintiff was hurt. He also says that, in pouring concrete, there is a volume of water that would separate from the concrete after it was poured. When the erection of the second floor of the building in question was begun, both defendants knew the manner of construction of the first floor, and the nature of the ceiling. They also knew that the store had been leased to the Gately Company, and that it was occupied, and would continue to be occupied, by the Gately people and their employees. The Gately store is 96 feet long and 20 feet wide, and is the second storeroom from the east side of the building. The office is about half way back. One of the columns is about midway of the office. The place where the plastering fell,

was near the column in the cashier's office. At the time the plastering fell, which injured plaintiff, he was inside the office, engaged in the performance of his duties.

Such, in a general way, is the nature of plaintiff's testimony; and, though denied by witnesses for defendants at some points, and though there is a sharp conflict in certain particulars, yet, taking the evidence altogether, we are of the opinion that, on this question of fact, there was evidence sufficient to take the case to the jury, and to sustain the verdict as to the ground of negligence submitted.

**1. NEGLIGENCE: landlord and tenant: injuries of employee of tenant: sufficiency of evidence.**

2. Error is predicated upon the overruling of the motion of each defendant for a directed verdict. The contention as to Stevens & Company is that a mere employee who is not an independent contractor is not liable for the master's tort, and as to defendant Martin, that he was not guilty of any negligence contributing to the falling of the plaster which injured plaintiff, for which liability could result. Cases are cited on each proposition. Appellee cites the case of *Manton v. Stevens & Co.,* 170 Iowa 495, to show that Stevens & Company were the agents or employees of defendant Martin. The evidence in the instant case shows that the arrangement between Stevens & Company and Martin was the same as in that case. No question is raised in the instant case but that, in the construction of this building and pouring of the concrete, Stevens & Company was acting within the scope of its employment for and in behalf of defendant Martin. If Stevens & Company were negligent, it was their tort, and the defendant Martin is responsible therefor. Of course, Stevens & Company might not be liable for the negligence

**2. PRINCIPAL AND AGENT: liability of principal: negligence of architect and engineer.**

of Martin alone. Appellee also contends

3. TRIAL: ver-
dict: form:
joint de-
fendants.

that the negligence alleged and submitted to the jury was the joint negligence of both defendants. However this may be, under the evidence before set out, the jury could have found that there was negligence, and that it was the negligence of Stevens & Company, or of both it and Martin. Under the evidence, we are unable to see any theory by which Stevens & Company or Martin would be alone responsible. This disposes of another error assigned: that the court erred in not submitting separate forms of verdict as to the defendants. The verdict should be moulded according to the facts, and to suit the exigencies of the case. Code Section 3730.

3. Appellants' next contention 'is that plaintiff was guilty of contributory negligence, as a matter of law. The thought is that he knew that the Gately Company was a

4. NEGLIGENCE:
landlord and
tenant: in-
juries to ten-
ant: contrib-
utory negli-
gence: suffi-
ciency of evi-
dence.

tenant; that the construction work was going on above; and that it was reinforced concrete; that he worked in the store several weeks while the work was going on; and that, if the testimony of the witness who observed the moisture upon the ceiling, at different places and at different times, is true, then plaintiff was guilty of negligence in not avoiding the obvious danger, if there was any, because of the moisture on the ceiling. Among the cases cited, we have examined *Reams v. Taylor*, 31 Utah 288 (8 L. R. A. [N. S.] 436, 437), and *Town v. Armstrong*, 75 Mich. 580 (42 N. W. 983). We are unable to see that the *Reams* case has any application. In the *Town* case, plaintiff was the tenant of defendant, and was injured by the falling of cellar stairs. Her own evidence showed that she had lived in the building for 13 years; was fully acquainted with the condition of the stairs; knew that they were rotten and rickety; and she had not gone down the stairs for over

a year. The court held that she was negligent, and grossly so; and that, even though the defendant was negligent, she went into a dangerous place, fully aware of the risk she was taking; that she was going down the stairs for a trifling purpose. Though plaintiff in this case, as an employee of the tenant's, may have had no greater rights than his employer,—and counsel for appellee so concedes, for the purposes of the case,—still, plaintiff had the right to be in the premises, and at the point where the plastering fell, when he was hurt. Regard should be had to the entire situation, the obviousness of the danger, plaintiff's duties, and his knowledge or lack of knowledge of the leaking, and its effect upon plastering. There was a jury question as to this.

4. It is assumed by appellants that, because of the provision in the lease, before set out, the tenant, Gately Company, would have no right of action; and that plaintiff has no greater right than his employer. Appellee concedes, for the purposes of the case, that plaintiff has no greater right of recovery against the landlord, Martin, than the tenant would have, under like circumstances. They concede, in like manner, that the landlord is not liable for hidden or latent defects, except such as were within his knowledge; although they say that the better rule is that he is liable for such defects as he should have known, in the exercise of reasonable care. We may say, in passing, that we think there was no question of latent defects. The defendants knew the effect on the plastering, and what was likely to follow, if it became wet. The clause in the lease relied upon by defendants, only waives the right of claim for damages resulting from the proper construction of the building, and not claim for damages because of negligence in the construction. Surely, the parties did not contemplate by this provision that the land-

5. NEGLIGENCE: landlord and tenant: construction of lease: damages from dangerous condition.

lord could proceed with the construction of additional stories to the building, in utter disregard of the rights of the tenant, and of the landlord's duty to the tenant. Under such a construction, the landlord could proceed in such a manner as to utterly destroy the tenant's stock of goods, and render the storeroom unfit for use. The plaintiff was rightfully in the storeroom. The clause in question excuses the landlord's entrance, and permits the work above the storeroom leased, and for the purposes indicated. Under the record, the lessor, by himself or his servants and agents, was creating a dangerous condition about the premises, from which injury resulted. His liability is for the affirmative wrong in creating a dangerous condition. *Poor v. Sears,* 154 Mass. 539 (28 N. E. 1046) ; *Barman v. Spencer,* (Ind.) 49 N. E. 9; *Davis v. Pacific Power Co.,* 107 Cal. 563 (40 Pac. 950) ; *Griffin v. Jackson L. & R. Co.,* 92 Am. St. 496, 499, and note.

5. When the jury was being empaneled, one of the jurors was asked whether he was, or had been, directly or indirectly, connected with any company which makes a business of insuring property owners or builders against damages growing out of personal injuries sustained by people who may be in the buildings which are being built or altered or added to. Defendants' objection to the question was sustained, and the plaintiff excepted. The ruling was in favor of the appellants, but they predicate error upon the asking of the question, as we understand it. Appellants cite *Northwestern Fuel Co. v. Minneapolis St. R. Co.,* 134 Minn. 378 (159 N. W. 832). A question somewhat similar was asked in that case, by defendant's counsel, to which the plaintiff, the unsuccessful party, excepted. The ruling was condemned by a dissenting justice, but was approved by the majority. Counsel for plaintiff may have had information that de-

6. TRIAL: examination of juror: association with insurance company: discretion of court: harmless error.

fendants were insured. Even though it was shown that the juror was so connected, and that it would not be a ground for challenge for cause, it might properly enough aid counsel for plaintiff in making their peremptory challenges. At any rate, there was nothing in the question to excite prejudice. We are unable to see any prejudice to the defendants. The trial court has a discretion in such matters. Furthermore, the asking of such a question was approved by this court in *Flick v. Globe Mfg. Co.*, 172 Iowa 561, 568.

6. Some of the instructions offered by defendants relate to matters which we have already discussed in this opinion. Others, in so far as they announced correct principles of law, are covered by the instructions of the court. The instructions given by the court are criticised, but the argument is broader than the exceptions taken thereto. The exception to Instruction No. 9 is that therein the court made mention of the pouring of concrete and water, and the claim is that there is no evidence in the record warranting the use of the word "water," because the evidence shows that only concrete was poured; and that, therefore, the instruction was misleading, and unfair to defendants. As before stated, the record shows that, unless the forms were tight, there would be a volume of water flowing away from the cement when it was poured, and that there always is in concrete work. Under the record, the jury could not have understood that the court referred to pouring water other than as it was in the thinned cement, and this always flowed away, as testified to by the superintendent of construction. Though perhaps the instruction is not accurately worded in regard to the matter complained of, still we think there could have been no prejudice.

Another sentence in Instruction No. 9 reads, substan-

7. TRIAL: instructions: applicability to evidence: instructions taken as a whole.

tially, that, if the jury should find that, in the pouring of said water and concrete, the defendants exercised reasonable care and diligence to prevent the water from entering the ceiling below, then plaintiff could not recover, etc. We think this states the correct rule, taken in connection with the other instructions given, considering all the circumstances in the case.

7. Lastly, it is argued that the verdict is excessive. It is true that, under the evidence, plaintiff's condition was somewhat improved at the time of the trial, in January, 1917; that he had gained some in weight;

8. TRIAL: verdict: excessiveness: personal injury. and that his severe headaches were less frequent. He had worked some at a reduced wage, prior to the time of the trial; but at the time of the trial, he was out of employment, because of his inability to properly perform the duties assigned him. The opinion is already too long, and we shall not go into detail as to his injuries. In a general way, the evidence shows that he was about 36 years of age, and his expectancy about 25 years. He had a diploma in bookkeeping and telegraphy, and had taught these lines in business colleges. He was injured by being struck on the head by the falling plastering, causing a fracture of the skull, intercranial hemorrhage, and intense suffering. Immediately, or very soon after his injury, his pulse was 120, but later dropped to about 40, indicating hemorrhage inside the skull and pressure on the brain. After he was able to be around, he attempted to do the same kind of work he had done for two of his former employers, and about two weeks for the Gately people, but he could not hold his position, the employer stating that he could not stand plaintiff around, because he was so nervous. In October, he commenced working for a former employer, and worked long enough to make out two months' bills. He could not keep books, made many mistakes, and was an entirely different man in his

disposition and competency as a bookkeeper. His weight was considerably reduced, though he had gained some at the time of the trial; his sleep is broken; he has a feeling of depression, and sickness of the stomach, is nervous, and worries about his condition; he cannot concentrate his mind as he used to; his memory is bad. The medical witnesses say that he received a very serious injury. They say that, as to the permanency, it is largely a matter of percentage; but the fact that he had not yet recovered would indicate a more serious injury, and show more strongly that it might be permanent. From 5 to 50 per cent of the injuries of this character result in epilepsy; some result in insanity; sometimes there are abscesses and brain tumors, severe headaches, and a general inability to attend to business. His doctors' bills were $235. There is nothing in the record to indicate passion and prejudice on the part of the jury, unless the amount of the verdict is so excessive as, in itself, to show passion and prejudice. Cases are cited by way of comparison, but they are not always helpful. The allowance of compensation is so largely within the discretion and judgment of the jury that, considering the seriousness of plaintiff's injury, we are not prepared to say that the verdict is too large.

Some other matters are argued; but those discussed in the opinion are controlling. We find no prejudicial error in the record, and the judgment is—*Affirmed.*

LADD, C. J., EVANS and SALINGER, JJ., concur.