Hillsborough,
Apr. 3, 1945. } No. 3521.

## NASHUA GUMMED & COATED PAPER COMPANY

*v.*

## NOYES BUICK COMPANY.

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Wyman orally),* for the plaintiff.

*Sulloway, Piper, Jones, Hollis & Godfrey (Mr. Piper* orally), for the defendant.

MARBLE, C. J. The plaintiff occupied a storehouse in Nashua under a written lease from the defendant. Wax, glue, tapioca flour, chromic acid, and rolls of paper were stored on the premises. In August, 1942, this storehouse was damaged by fire. Extensive repairs were required, and the plaintiff coöperated with the defendant in securing the necessary priority order from the War Production Board. A construction engineer, employed by the defendant, drew plans and specifications for these repairs, and the Osgood Construction Company was engaged to perform the work under a written contract approved by the engineer and signed by the construction company and the defendant. The engineer had "general supervision of the entire job."

The plans and specifications indicated that some of the work incident to the removal of the steel girders and trusses would require the use of an acetylene torch, and it was understood that the repairs would be made with the plaintiff's goods still in place.

There was testimony to the effect that an acetylene torch is a "hazardous and dangerous equipment" since, when in use, it scatters globules of molten metal, heated often to 2,786 degrees Fahrenheit. These globules are likely to ignite any combustible substance with which they come in contact within a distance of 50 feet, and special precautions are necessary to guard against this contingency. According to the plaintiff's expert, inflammable material near at hand should be covered by a single sheet of asbestos or specially treated canvas, the staging on which the operator stands should be inclosed, and water under pressure should be available.

The construction company, before using the acetylene torch, covered the plaintiff's goods with three-foot strips of asphalt paper, and hired a workman to stand guard with a pail or two of water and a broom. During the first day several "little fires" and a "big fire" about "three feet in diameter" were kindled by sparks caused by the torch. The "big fire" started in a "pile of rubbish" composed of burlap and wax shavings which had been scraped from the cakes of wax in the salvaging operations following the original fire. This "big fire" was extinguished only after the construction company's foreman had come to the assistance of the man with the pail and broom.

The fire which caused the loss for which recovery is sought occurred on the next afternoon. It was discovered when smoke

was seen coming from beneath the asphalt-paper covering close to the place where the torch was being used. It could be found to have been caused by the entrance of a spark at some point where the ends of the strips of paper failed to meet.

The rule governing the defendant's responsibility for the act which caused the plaintiff's loss is thus stated by Mechem in his work on Agency (*s.* 1918): "Though the act be not one necessarily resulting in injury but is 'one which, from its nature, will probably, unless precautions are taken, do injury to others, it is, by the weight of authority, the duty of every person who does it in person or causes it to be done by another to see to it that those precautions are taken, and he cannot escape this duty by turning the whole performance over to a contractor."

Among the many authorities cited in support of this doctrine is the case of *Thomas* v. *Harrington,* 72 N. H. 45. In this case the language of Lord *Cockburn* in *Bower* v. *Peate,* 1 Q. B. D. 321, 326, 327, is quoted with approval, and the case of *Wright* v. *Holbrook,* 52 N. H. 120, is distinguished on the ground that no question was there raised as to whether the work the independent contractor was employed to do was essentially dangerous to the property of others or whether, if it was, the defendant could escape liability therefor because of the contract.

It has been said of the rule in question that "the mere circumstance that the particular work is likely to result in harm to third persons is enough to convert a contractor into a servant." 2 U. of Chi. Law Rev. 501, 503. Nor is the application of the rule restricted, as the defendant asserts, to work which involves serious bodily harm or death. See *Norwalk Gaslight Co.* v. *Norwalk,* 63 Conn. 495, 527; *Carlton &c. Ins. Co.* v. *Foley,* 117 Minn. 59.

The evidence in the present case fully warrants a finding that the use of the acetylene torch was "dangerous in itself" (*Thomas* v. *Harrington, supra,* 47), that the conduct of the Osgood Construction Company did not measure up to that degree of care which the situation reasonably demanded, and that its failure in this respect caused the fire. It cannot be said as a matter of law that the plaintiff was guilty of any fault which contributed to its loss. The issue of contributory negligence was submitted to the jury.

In view of the foregoing discussion it is unnecessary to consider the plaintiff's contention that, so far as the performance of his supervisory duty was concerned, the construction engineer acted as the agent of the defendant.

But the defendant contends that its motion for a directed verdict should have been granted because of the following provision in the lease: "The Lessee covenants and agrees that the Lessee will pay all charges for electric current used on the leased premises and render the Lessor harmless from any claims for loss or damage from fire, theft, or leakage to merchandise, equipment, fixtures, machinery, or property of the Lessee during the entire period of occupancy by the Lessee."

Defendant's counsel concede that in this jurisdiction the ordinary contract exempting a person from liability for the consequences of his negligence is held to be void as against public policy. *Conn* v. *Company*, 79 N. H. 450, 452; *Wessman* v. *Railroad*, 84 N. H. 475, 478, 479; *Papakalos* v. *Shaka*, 91 N. H. 265, 268. They call attention, however, to the fact that the defendant was not negligent in selecting either the contractor or the engineer and cite authority to the effect that "a bargain to release from liability one who has not been negligent in selecting a person for whose future negligent acts he would otherwise be responsible is less opposed to public policy than a bargain to exempt one from liability for the consequences of his own negligence." 6 Williston Contracts (Rev. *ed.*), *s.* 1751B, *p.* 4967.

They also suggest that agreements of this nature should not be declared invalid where, as here, the parties have equal bargaining power and no duty is owed to others (see 37 Colum. Law Rev. 248), nor where the negligence of the promisee does not cause bodily harm.

We deem it unnecessary to discuss these contentions, however, or to determine whether the rule governing exculpatory contracts has been too broadly phrased in our decisions, for we believe that the covenant under consideration was not intended to apply to such an extraordinary situation as that here disclosed.

The word "fire" follows a reference in the covenant to electric current (a common source of fire) and precedes the words "theft" and "leakage" — matters which are usually due merely to the landlord's "failure to maintain an active vigilance in the examination of the premises" (*Drescher Rothberg Co.* v. *Landeker*, 140 N. Y. S. 1025, 1026). The word must be held to have been used in the sense "which best harmonizes with the context" (*Davis* v. *Company*, 88 N. H. 204, 207), and to extend its meaning to include a fire caused by dangerous affirmative acts in which the landlord has acquiesced is to stretch it to an unwarranted length. Authority for this conclusion

is not lacking.  See *Cairnes* v. *Company*, 214 Ala. 545, 548; *Mortrude* v. *Martin*, 185 Iowa 1319, 1330, 1331; *Kessler* v. *The Ansonia*, 253 N. Y. 453; *Railton* v. *Taylor*, 20 R. I. 279; 6 Williston, Contracts (Rev. *ed.*), *s.* 1751C, *p.* 4969.

"Even where the parties have included broad exculpatory provisions relieving the landlord from liability for damages caused by water, steam, and gas, the interpretation accorded such stipulations by the courts has been to limit their effect to injuries resulting from wear and tear, inherent defects, actions of the elements, or the negligence of other occupants of the building.  With but few exceptions, these clauses have not immunized the landlord from responsibility for his acts of affirmative negligence."  42 Yale Law Journal, 139, 140.  The argument that the exculpatory provision in question was intended to apply to affirmative acts of negligence because expressly declared to apply to the lessee's entire period of occupancy is unconvincing.

There was no error in the denial of the defendant's motion for a directed verdict.

In the course of the direct examination of the plaintiff's expert, counsel inquired if he had ever seen fires caused by an acetylene torch.  On receiving an affirmative answer, counsel asked how far distant he had known a fire to occur "from where the torch was being used."  Defendant's counsel then interposed:  "Is this on steel near this size, or great big steel? — in a building with combustible material more or less like this? — or is there going to be any comparison?"  Plaintiff's counsel suggested that the witness answer the question generally and then explain.  Thereupon the Court allowed the witness to answer, and the defendant excepted.

That part of the ensuing testimony which the defendant now declares it was iniquitous for the Presiding Justice to admit was the statement of the witness, "I might say that on the job I am now engaged in we have been burning light structural steel on top of the wind turbine tower, which is one hundred and twenty feet above ground level, and have set grass fires as far as three hundred feet from the base of the tower."

The defendant did not request the Court to strike this testimony from the record (see *Emerson* v. *Company*, 87 N. H. 108, 113), the information it contained could be found to be of use to the jury (see *Goddard* v. *Company*, 82 N. H. 225, 230; *Russell* v. *Railroad*, 83 N. H. 246), and it was not prejudicial as a matter of law (*Pope* v. *Railroad*, 79 N. H. 52, 53; *Spilene* v. *Company*, 79 N. H. 326, 330).

The same witness was asked on cross-examination as to whether the heat of a globule of molten metal would not be "pretty well dissipated" by the time it had burned through asphalt felt. It was proper for plaintiff's counsel to continue the subject which defendant's counsel had introduced by asking, "What proportion of the heat of a globule would be dissipated by burning through the asphalt felt?" See *State* v. *Hale*, 85 N. H. 403, 408, 409.

The defendant excepted to the refusal of the trial Court to grant the following request for instructions: "If you find that the work contemplated by the contract between Noyes Buick Company and Osgood Construction Company was not inherently or intrinsically dangerous but that it was made so by means of chippings or shavings of wax and burlap left on the floor of the warehouse by employees of Nashua Gummed & Coated Paper Company, and by the action of Nashua Gummed & Coated Paper Company in covering combustible material and thereby creating an extra hazardous situation and that the fire was caused by such extra hazardous condition, you cannot hold the defendant liable for any negligence of Osgood Construction Company or any of its employees."

The defendant claims that the fire originated in rolls of paper which were "no more inflammable than sticks of wood" and that the rapidity with which the fire spread warranted the inference that the rolls of paper, unknown to the defendant or the contractor, had been piled on top of a heap of burlap and wax shavings.

Plaintiff's counsel suggest that a finding in accordance with the theory thus advanced would involve conjecture rather than inference. But be that as it may, the charge, we believe, dealt sufficiently with the question of a concealed danger, which was the subject of the request. The construction company took the premises as it found them, having agreed, by acceptance of the specifications, to "make a thorough inspection of the premises and familiarize" itself therewith.

The jurors were instructed that if they found that the work contemplated by the contract between the construction company and the defendant was not inherently dangerous they could not hold the defendant liable; that the construction company "adopted the conditions which existed in the storehouse when it undertook the work in so far as it had actual knowledge of them, or by the exercise of reasonable care might have become informed with respect thereto," but that it did not adopt "conditions of which it did not know" and of which it "could not be informed by the exercise of due care."

354

Exception was also taken by the defendant to the refusal of the Court to instruct the jury as follows: "Under the terms of the lease Nashua Gummed & Coated Paper Company had the exclusive right to the possession and control of the premises and this was true at the time of the fire except that Osgood Construction Company had been given permission to occupy the premises to the extent necessary to make the repairs."

The defendant claims that this requested instruction should have been given in order to dispel any doubt the jury may have entertained as to the plaintiff's right to enter the storehouse to protect its property. It is true that the plaintiff's superintendent of inventory, on being asked why he had not looked the storehouse over after the construction company had started work, replied: "That building didn't belong to me. It didn't belong to the company." But in answer to the next question he stated that "our men" (plaintiff's employees) did the "salvaging operations on this wax and paper." And both the defendant's construction engineer and the plaintiff's foreman testified at length regarding the work which these men were doing on the premises while the repairs were in progress. The lease was an exhibit in the case and the jurors were expressly authorized by the Court to examine the exhibits in any way they might desire. It is inconceivable that they could have gained the impression that the plaintiff had no right to enter the storehouse and care for its goods.

All exceptions are overruled.

*Judgment on the verdict.*

All concurred.