**Barry S. LEVY and Roberta Williams, Appellants,**

v.

**Charles G. CURRIER and Central American Refugee Center, Appellees.**

No. 88–95.

District of Columbia Court of Appeals.

Argued Nov. 9, 1989.

Decided Feb. 28, 1991.

Sharon S. Van Pelt, for appellants. Ronald J. Ewalt was on the brief for appellants.

Mary T. Porter, for appellee Currier.

Gary A. Ulmer, for appellee Central American Refugee Center.

Before BELSON, TERRY, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellants Levy and Williams, who are husband and wife, own a town house on M Street, Northwest, next door to a town house owned by appellee Currier. They sued Currier for damages resulting from a fire that occurred when workmen, using an acetylene torch, attempted to remove a fire escape that was attached to Currier's house. Currier added the Central American Refugee Center (CARC), the employer of the workmen, as a third-party defen-

dant. After a non-jury trial, the court entered findings of fact and conclusions of law favorable to Currier and CARC and granted their motion to dismiss the complaint, albeit without prejudice.[1] Appellants contend on appeal that the trial court erred in (1) failing to determine whether the use of an acetylene torch is an inherently dangerous activity, which would nullify Currier's shelter from liability under the independent contractor rule; (2) *failing to* determine whether Currier was negligent in hiring CARC to remove the fire escape and therefore was liable for the negligence of CARC's workmen; (3) failing to find that CARC was an agent of Currier, which would make Currier vicariously liable for the negligence of CARC's workmen; and (4) failing to find Currier negligent under the doctrine of *res ipsa loquitur.* We agree with the trial court that CARC was not an agent of Currier and that *res ipsa loquitur* is not applicable to this case. We hold, however, that the trial court erred with respect to the acetylene torch and negligent hiring issues, and thus we reverse the judgment and remand the case for further proceedings.[2]

## I

Appellants' town house was seriously damaged by a fire which began in a bird's nest on a window sill of the town house next door, owned by appellee Currier, and then spread to the roof of appellants' home. At the time of the fire, Currier's house was undergoing renovation under the supervision of his agent, Curtis Johnson.[3]

Some time before the date of the fire, Currier had instructed Johnson to have a fire escape removed from the front of his house. Paul Leach, a contractor who was

1. A motion to dismiss under Super.Ct.Civ.R. 41(b) is the procedural equivalent, in a non-jury trial, of a motion for directed verdict in a jury trial. *See Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978).

2. Appellees argue that this appeal should be dismissed because appellants did not file their brief until twenty-eight days after it was due. Their argument ignores the fact that on March 28, 1989, this court granted appellants' motion for leave to file their brief late and denied

appellees' joint motion to dismiss the appeal. We see no reason to revisit the issue now, although we remind counsel—in this and other cases—that dismissal of an appeal is an available sanction for an appellant's failure to file a brief on time. *See* D.C.App.R. 31(c).

3. Johnson was employed by Currier as a carpenter to repair, maintain, and renovate the house. It is undisputed that Johnson was Currier's agent for this purpose.

doing work for CARC, mentioned to Johnson that CARC was in need of a fire escape for its own building. Leach asked Johnson whether he would consider donating the fire escape, on behalf of Currier, to CARC. Johnson then spoke with Joaquin Dominguez Parada, the executive director of CARC, regarding the donation. Dominguez orally agreed to accept the fire escape on behalf of CARC and to arrange to have it removed, and further assured Johnson that CARC would accept responsibility for any damage to Currier's town house that might result from its removal. Johnson's belief in Dominguez's authority to carry out this arrangement derived both from his conversations with Dominguez and from representations made by Leach.[4]

Johnson testified at trial that he accepted Dominguez's assurance that CARC would engage someone competent to effect the removal of the fire escape. Johnson said he "possibly might have mentioned" to Dominguez that the fire escape could simply be unbolted from the building, since it appeared to be attached by "long bolts and nuts," but he understood from Dominguez that welding equipment might be used. Johnson conceded that he did not know "whether these welders who were going to be utilized had ever engaged in this type of operation before" or what safety precautions, if any, might be taken as part of the removal operation.

Finally, Johnson stated that he was not aware of any birds' nests on the window sills of Currier's house at the time CARC's workmen arrived to remove the fire escape. He had previously seen to it that such nests were removed as they were found. No particular warnings were given to Dominguez or CARC regarding any adverse conditions on the premises because Johnson assumed that "anyone that was hired by Mr. Dominguez ... who would have any instruments such as a torch would have the common sense to be able to check out and see whether there was any flammable material there that could indeed possibly cause a fire."

On the appointed morning, workmen hired by CARC appeared at Currier's home to remove the fire escape, bringing with them a saw, a ladder, and other equipment.[5] Marthlu Bledsoe, a neighbor, talked with the men, who spoke Spanish, and was told that they were affiliated with a non-profit group to whom Mr. Currier had given the fire escape and were taking it with Currier's permission. The workmen then began to remove one section of the fire escape with the aid of a torch; as they did so, Bledsoe saw "a small, very small shower of sparks." She then left to run an errand, and when she returned fifteen minutes later, she found the entire street blocked by fire equipment. Firemen were in the process of extinguishing a fire which, she soon learned, had damaged Mr. Currier's house and the two houses on either side, appellants' on the west and hers on the east. Several days later, after a fire marshal had forbidden the further use of a torch, workmen came back and removed the rest of the fire escape with hacksaws.[6]

Thomas Gardner, a fire inspector with the District of Columbia Fire Department's Investigation Unit, examined the site of the fire to determine its cause. He concluded that the fire began when a piece of slag (molten metal) or a spark from the acetylene torch used by the workmen landed in a bird's nest, which was on a window sill near the roof of Currier's house. Once ignited, the fire quickly moved from the bird's nest into Currier's house and then spread to the two adjoining houses. The bird's nest, according to Gardner, was approximately five feet from the point on the fire escape where the torch was being used. Inspector Gardner noted that the workmen did not have a fire extinguisher with them, nor had they obtained a permit for the work they were doing as mandated

4. Leach told Johnson that Dominguez was the head of CARC and that Dominguez paid Leach for the work he did on behalf of CARC.

5. The workmen were never identified by name at trial.

6. Bledsoe also testified that birds' nests were common to all the houses on the block; "it's a problem we all· have."

by the District of Columbia Fire Prevention Code.[7]

Monica Yriart, a staff attorney with CARC, testified that the by-laws of CARC did not grant the executive director, Mr. Dominguez, the right to commit funds for CARC without the approval of the Board, but that he was vested with authority to run the organization.

At the close of the trial, the judge heard argument from counsel on the defendants' motion to dismiss the complaint and then took the case under advisement. A few days later he issued an order which contained the following conclusions of law:

Plaintiffs argue that defendant Currier was negligent and thus liable to plaintiff on the theory of *res ipsa loquitur.* At the close of trial, third-party defendant CARC renewed its motion to dismiss on the grounds that *res ipsa loquitur* does not apply to this situation and urging that the complaint against CARC be dismissed as showing no negligence on the part of CARC. Defendant Currier joined third-party defendant CARC's motion to dismiss claiming that no negligence was shown on the part of Currier.

The doctrine of *res ipsa loquitur* only applies in cases "[w]here there is no direct evidence to show cause of injury, and the circumstantial evidence indicates that the negligence of defendant is the most plausible explanation for the injury...." Prosser and Keeton, The Law of Torts § 40 p. 257 (5th ed. 1984) (citing *Roark v. St. Paul Fire & Marine Insurance Co.*, 415 So.2d 295 (La.App.1982). Therefore, the Court agrees with the third-party defendant and the defendant that *res ipsa loquitur* does not apply in this case.

Furthermore, the Court finds no negligence on the part of defendant Currier for allowing a bird's nest to form in his window. Allowing such a nest to be built as in this situation cannot be considered an unreasonable risk. In addition, the casual agreement made between defendant's agent, Curtis Johnson, and CARC's representative, Joaquin Dominguez Parada, did not seem to place defendant Currier in a position where he should be considered liable for the actions of the members of CARC. Consequently, it appears to the Court that the plaintiff has failed to establish any negligence on the part of defendant Currier.

Although plaintiff made assertions of negligence on the part of third-party defendant CARC, these claims are technically irrelevant since plaintiff never successfully joined CARC as a co-defendant with Currier. Accordingly, third-party defendant CARC could only be held liable to defendant Currier if Currier is found liable to plaintiff Levy. However, plaintiff was unable to establish that defendant Currier was negligent.

The judge then granted the motion to dismiss. This appeal followed.

## II

Appellants maintain that the trial court erred in dismissing their complaint.[8] Their principal argument is that the court's failure to find that the use of an acetylene torch was an inherently dangerous activity was reversible error. The lack of such a finding is crucial to appellants' claim against Currier, since appellants failed to name CARC as a co-defendant, and (putting aside for the moment their allegation of negligent hiring) Currier would not oth-

---

7. **12D DCMR § F–102.1** (1987) provides:

It shall be unlawful to engage in any business activity involving the handling, storage or use of hazardous substances, materials or devices; to maintain, store or handle materials; to conduct processes which produce conditions hazardous to life or property; to install equipment used in connection with such activities; or to establish a place of assembly without first notifying the Fire Chief [and obtaining a permit].

8. The trial court stated in its order that the dismissal was without prejudice. We assume that this was an inadvertent error. One would normally expect a dismissal under Civil Rule 41(b)—which is, after all, an adjudication on the merits, as the rule itself states—to be entered *with* prejudice, especially after completion of the plaintiff's case, when the plaintiff has presumably offered all the evidence that he or she has to offer. Appellants do not raise this as an issue on appeal, however, and in any event it has no effect on our decision.

erwise be liable for the negligence of CARC's workmen.[9] We agree with appellants that the court should have resolved this issue, and hence we remand the case for further findings.

 The well-established general rule in this jurisdiction is that when a person hires another to do certain work, reserving no control over either the work or the workmen, a relationship of contractee and contractor exists (as opposed to master and servant),[10] and the contractee is not liable for injuries to a third party resulting from the work of the independent contractor. *E.g., Washington Metropolitan Area Transit Authority v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 868 (D.C. 1982). There are, however, a number of exceptions to this rule, one of which is that the contractee may be liable for such injuries when the work performed by the independent contractor is inherently dangerous. *Id.* at 868; *Lindler v. District of Columbia,* 164 U.S.App.D.C. 35, 38, 502 F.2d 495, 498 (1974); *see Vale v. Bonnett,* 89 U.S. App.D.C. 116, 121, 191 F.2d 334, 339 (1951) (drawing a distinction between "inherently dangerous" and merely "unsafe"). This exception is stated as follows in the RE-STATEMENT (SECOND) OF TORTS § 427 (1965):

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

The reporter's note under section 427 in the Appendix to the Restatement lists a number of situations in which this exception has been applied, one of which is the use of an acetylene torch near inflammable materials in repairing a building. The comments to section 427 make clear, moreover, that its application is not limited to intrinsically hazardous work. Comment b states in part:

> It is not, however, necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, such as death or serious bodily injury. It is not necessary that the work call for any special skill or care in doing it. It is sufficient that work of any kind involves a risk, *recognizable in advance,* of physical harm to others which is inherent in the work itself, *or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done.* [Emphasis added.]

The rationale for this exception to the independent contractor rule is that "the employer is in the best position to identify, minimize, and administer the risks involved in the contractor's activities." *Wilson v. Good Humor Corp.,* 244 U.S.App.D.C. 298, 306, 757 F.2d 1293, 1301 (1985) (citations omitted). Crucial to a contractee's liability, therefore, is whether the contractee knows or has reason to know of the special danger inherent in the activity of the independent contractor. RESTATEMENT, *supra,* § 427; *see Wilson v. Good Humor Corp., supra,* 244 U.S.App.D.C. at 306, 757 F.2d at 1301. The existence *vel non* of such knowledge is obviously a question of fact.

 There is evidence in this record which would surely support a finding that Currier knew or had reason to know that

---

**9.** Currier filed a third-party complaint against CARC seeking indemnity "for all sums as may be adjudged against him in favor of [appellants] ... or for their [*sic*] contributive share of said sum...." Appellants, however, never amended their complaint to include CARC as a co-defendant in their suit against Currier.

**10.** The right to control the workmen, not only as to the final result but in the performance of the task itself, is the most important factor in determining whether someone is a servant or an independent contractor. *Grace v. Magruder,* 80 U.S.App.D.C. 53, 55, 148 F.2d 679, 681, *cert. denied,* 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426 (1945).

severing the fire escape from the building would require the use of a welding torch. Mr. Johnson, Currier's agent, acknowledged in his testimony that the use of welding equipment was foreseeable. He also testified that Mr. Dominguez assured him that CARC would hire a crew of men experienced in the use of welding equipment and the removal of fire escapes. A reasonable trier of fact could find, therefore, that both Johnson and Dominguez were alert to the possible hazards inherent in the removal of a fire escape with the aid of a torch.[11]

Whether the use of an acetylene torch is inherently dangerous is an additional question of fact left unanswered by the trial court. The few appellate courts which have dealt with the issue have generally upheld findings that the use of such a device is an intrinsically dangerous activity. The leading case appears to be *Nashua Gummed & Coated Paper Co. v. Noyes Buick Co.*, 93 N.H. 348, 41 A.2d 920 (1945). In *Nashua* there was

> testimony to the effect that an acetylene torch is a "hazardous and dangerous equipment" since, when in use, it scatters globules of molten metal, heated often to 2,786 degrees Fahrenheit. These globules are likely to ignite any combustible substance with which they come in contact within a distance of 50 feet, and special precautions are necessary to guard against this contingency.

*Id.* at 349, 41 A.2d at 921. The court concluded that the evidence "warrant[ed] a finding that the use of the acetylene torch was 'dangerous in itself'...." *Id.* at 350, 41 A.2d at 922 (citation omitted). *See also Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 378–379, 578 P.2d 1045, 1050–1051 (1978). The only decision we have found to the contrary is *Brownsville Navigation District v. Valley Ice & Fuel*

*Co.*, 313 S.W.2d 104 (Tex.Civ.App.1958). The court in that case did not actually decide the issue, focusing instead upon the employer's lack of knowledge that a torch would be used, which would render the "inherently dangerous activity" exception inapplicable. The court went on to state, however, "We doubt that the use of the acetylene torch was an inherently dangerous operation, since it was the negligent manner of its use which resulted in the fire." *Id.* at 106 (citation omitted).

We choose in this case to follow the lead of the *Nashua* court. Inspector Gardner testified that the fire ignited when a piece of slag or a spark from the acetylene torch landed in a bird's nest on a window sill near the roof of Currier's house. Marthlu Bledsoe, Currier's neighbor, saw a small shower of sparks escape from the torch. Given the proximity of the torch to the inflammable bird's nest, a reasonable trier of fact could find that the workmen's use of an acetylene torch was "dangerous in itself." *Nashua, supra*, 93 N.H. at 350, 41 A.2d at 922. The trial court on remand, therefore, must make findings on two factual issues: First, under all the circumstances, was the use of an acetylene torch an inherently dangerous activity? Second, did Currier, through his agent Johnson, know or have reason to know of the danger or risk involved?

If the answer to both of these questions is yes, the trial court must then determine whether CARC was negligent in performing its task—*i.e.*, whether CARC's workmen were negligent either in the way they did the work or in their failure to have a fire extinguisher available or to obtain a permit as required by the Fire Prevention Code. Once an independent contractor is found negligent, the contractee's liability for any resulting harm under the inherent-

---

**11.** Both Currier and CARC assert that, because of the donative nature of the transaction between them, CARC was merely a volunteer, and therefore the "inherently dangerous activity" doctrine does not apply in this case. We cannot agree. Clearly, both Currier and CARC would profit from the eventual removal of the fire escape. Currier would have had to contract with, and pay compensation to, another inde-

pendent contractor to effect removal, and CARC would have been obliged to acquire a fire escape from another source. Additionally, CARC guaranteed to make Currier whole for all damage done to his property. But even if we were to accord CARC status as a volunteer, that status would not necessarily shield Currier from liability. *See* RESTATEMENT (SECOND) OF AGENCY § 225 & comment a (1958).

ly dangerous activity exception depends on whether the contractee had a duty to the injured person and whether that duty was breached by the contractor. If such a breach actually resulted from the work of the independent contractor, then the contractee may not escape liability. *Bailey v. Zlotnick*, 80 U.S.App.D.C. 117, 118, 149 F.2d 505, 506 (1945). Should the trial court find, therefore, that CARC, acting as independent contractor for Currier, negligently engaged in an inherently dangerous activity, breaching a duty owed to Currier's neighbors, then those neighbors—appellants—may be entitled to recover for the damage to their home. All of these questions remain to be resolved on remand.

### III

■ An additional basis for appellants' claim against Currier is their allegation that Currier was negligent in selecting CARC to remove the fire escape. If he was, he may be found liable for the negligence of CARC's workmen. Because the trial court failed to resolve this issue, we remand for findings on Currier's alleged negligent hiring of CARC as an independent contractor.[12]

For guidance we turn once again to the RESTATEMENT (SECOND) OF TORTS (1965). Section 411 of the Restatement tells us:

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

The comments to section 411 offer further enlightenment. Comment a provides a definition:

The words "competent and careful contractor" denote a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others....

Comment b, describing the reach of section 411, states in part:

In order that the employer may be subject to liability it is ... necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust work to him. Thus, if the incompetence of the contractor consists in his lack of skill and experience or of adequate equipment but not in any previous lack of attention or diligence in applying such experience and skill or using such equipment as he possesses, the employer is subject to liability for any harm caused by the contractor's lack of skill, experience, or equipment, but not for any harm caused solely by the contractor's inattention or negligence.

Given the dearth of pertinent case law in the District of Columbia,[13] we conclude that we should apply the principles of section 411 of the Restatement to this case. Accordingly, we hold that appellants must prove two things. First, they must establish that Currier was negligent—*i.e.*, that he did not exercise reasonable care, as set forth in section 411—in selecting CARC to

---

12. Currier relies on *Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C.1985), in urging us to reject appellants' claim of negligent hiring. The rule set forth in *Giles*, however, is premised upon the existence of a master-servant relationship, which did not exist in this case. According to *Giles*, when it is proven that the employer (master), having control over the employee's (servant's) actions, "knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee," the employer may be found liable for the

actions of the employee. *Id.* at 613 (emphasis in original; citation omitted). In this case (as in *Giles*) there was no master-servant relationship, and hence this rule does not apply.

13. The only local case we have found is *Wilson v. Good Humor Corp., supra*, which briefly summarizes the law in a short section near the end of the opinion. 244 U.S.App.D.C. at 314–315, 757 F.2d at 1309–1310. *Wilson*, of course, is not binding precedent, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), but it is quite helpful.

do the work. Second, appellants must show that there was a causal connection between Currier's negligent hiring of CARC and the resulting damage; the injury must "result from some quality in the contractor which made it negligent for the employer to entrust the work to him." RESTATEMENT, *supra,* § 411 comment b; *see also Western Stock Center, supra,* 195 Colo. at 376, 578 P.2d at 1048–1049. We remand the case so that the trial court, in the first instance, may determine whether appellants have made the requisite showing.[14]

## IV

Appellants' two remaining contentions are without merit.

■ We agree with the trial court that no agency relationship existed between Currier and CARC. Johnson, Currier's agent, relinquished control over the actual removal of the fire escape to CARC and was, in fact, absent from the premises on the day set for removal. The right to control an employee's conduct in the performance of the task and in its result is determinative in establishing the existence of a master-servant relationship. *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860 (D.C.1982); *Grace v. Magruder, supra,* 80 U.S.App.D.C. at 55, 148 F.2d at 681. The evidence in this case showed that Currier, through Johnson, had no such right. It follows that CARC's workmen were not Currier's servants or agents, and that there was no agency relationship between Currier and CARC.

■ Appellants also argue that the court committed reversible error in failing to find Currier liable under the doctrine of *res ipsa loquitur.* That doctrine is applicable, however, as the trial court recognized, only "'[w]here there is no direct evidence to

show cause of injury, and the circumstantial evidence is the most plausible explanation for the injury....'" PROSSER & KEETON, THE LAW OF TORTS § 40, at 257 (5th ed. 1984) (footnote omitted); *see also Bell v. Westinghouse Electric Corp.,* 483 A.2d 324, 329 (D.C.1984). In this case the cause of the fire was essentially undisputed; the issue being litigated was whether liability for the damage should fall on Currier. We agree with the trial court that *res ipsa loquitur* had nothing to do with this case.

## V

In summary, we hold that the trial court erred in failing to decide two factual issues: whether the use of an acetylene torch was an inherently dangerous activity, bringing this case within an established exception to the independent contractor rule, and whether Currier was negligent in hiring CARC to remove the fire escape. Those issues must be resolved on remand, for they are at the heart of this litigation. Since the case was tried to the court without a jury, we leave it up to the trial court, in its discretion, to decide whether to take additional evidence or whether it can make the necessary findings from the existing record. The court may also receive such additional arguments or written submissions from the parties as it may deem appropriate. We reject appellants' other assignments of error.

*Reversed and remanded.*

---

**14.** A partial list of factors for the trial court to consider in determining the degree of care required when selecting an independent contractor is found in comment c to section 411 of the Restatement. Those factors include:
(1) the danger to which others will be exposed if the contractor's work is not properly done; (2) the character of the work to be done—whether the work lies within the competence of the average man or is work which can be properly done only by persons possessing special skill and training; and (3) the existence of a relation between the parties which imposes upon the one a peculiar duty of protecting the other.