**DISTRICT OF COLUMBIA, Appellant,**

v.

**Dedrick HOWELL, et al., Appellees.**

**No. 90–639.**

District of Columbia Court of Appeals.

Argued Feb. 27, 1992.
Decided April 24, 1992.

**5.** *Id.* (quoting *Roviaro, supra,* 353 U.S. at 60, 77 S.Ct. at 628).

Donna M. Murasky, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Rieschel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant.

Stephen Raber, with whom Jeremiah C. Collins, Washington, D.C., was on the brief, for appellees.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellees Dedrick Howell and his parents sued the District of Columbia and The American University for severe injuries which Dedrick sustained because of an accidental explosion during a chemistry class for gifted and talented children at the Ben W. Murch School summer program. After a ten-day trial, a jury found the District of Columbia negligent under each of several alternative theories: (1) the principal of the Murch School, Mary Gill, had failed to exercise ordinary care for the safety of the children in the summer program; (2) the director of the program, Greg Butta, had failed to exercise ordinary care, and because he was an apparent agent of the District of Columbia, his negligence was attributable to the District; (3) the chemistry teacher, A. Louis Jagoe, was also negligent and his negligence was attributable to the District because he was an independent contractor engaged in an inherently dangerous activity;[1] (4) both Butta and Jagoe violated District of Columbia regulations against manufacturing fireworks; and (5) the District, by permitting the presence and use of dangerous chemicals, failed to maintain the school premises in a reasonably safe manner. The jury awarded eight million dollars to Dedrick individually for pain and suffering, one million dollars to his parents for past and future medical expenses, and one million dollars to each of

1. Both Greg Butta and A. Louis Jagoe were sued by the District of Columbia as third party defendants, along with a counselor at the program, Rebecca Seashore. A. Louis Jagoe was declared bankrupt during the trial and was dismissed as a party. The jury returned a verdict in favor of Rebecca Seashore, finding that she had not been negligent. The District's claim against Greg Butta was not submitted to the jury. Following the jury's verdict, the trial court entered judgment against him in favor of the District for contribution.

Dedrick's parents individually for loss of parent-child consortium.[2]

In a post-trial motion, the District challenged each basis of liability as well as each damage award. In a Memorandum of Decision and Order, Judge Sylvia Bacon denied the District's motions for a directed verdict, judgment notwithstanding the verdict, and new trial or remittitur. On appeal, the District again attacks each ground of liability and the award of damages for loss of parent-child consortium and future medical expenses. It asks alternatively for a new trial because the verdict was against the weight of the evidence and because of trial errors. It does not challenge independently the denial of a remittitur. We affirm the judgment as to liability but reverse the award of damages for loss of consortium and future medical expenses.

I.

Evidence established that the Murch School Summer Discovery Program was designed to provide hands-on education for gifted and talented eight and nine year old children. The program originated in 1985 when Mrs. Gill, the Murch School principal, attended a reception at Mount Vernon College arranged by Greg Butta, a Ph.D. candidate at The American University, to advertise the success of a summer program he had conducted at Mount Vernon. The program interested Mrs. Gill, and after several discussions, Butta sent her a formal proposal for conducting a similar program at the Murch School. Gill proposed changes to the proposal, then solicited and received approval for the program from the Assistant Superintendent for the District of Columbia Public Schools.[3] Brochures for the program drawn up by Butta were sent home with the Murch School pupils and mailed out, under school letterhead, to parents whose children attended other District schools.

Butta hired the staff for the summer program, including some of the instructors who had taught in the Mount Vernon program. Mrs. Gill, however, reviewed all of the instructors' resumes, had veto authority over their hiring, and interviewed most of the staff, including A. Louis Jagoe, before the hiring was made final. Jagoe, who was hired to teach chemistry to the eight and nine year olds in the program, held a master's degree in chemistry and was a Ph.D. candidate at The American University. Before the first general staff meeting, he told Butta that as part of the class he would do a luminescence experiment and a "cold-pack" experiment, and wanted to make sparklers with the children. Jagoe and Butta discussed the safety of the sparkler experiment only in regard to the location where the children would be allowed to light the sparklers.

On August 1, 1985, a staff meeting was held at which Gill, Butta, and all instructors and counselors were present. Each instructor gave a brief talk about what he or she intended to do in class. Several instructors testified that Jagoe told the group, including Mrs. Gill, that he planned to make sparklers as one of the chemistry experiments. Gill, who was in and out of the meeting, did not remember hearing Jagoe discuss the experiment, although notes she took at the meeting reflect that she heard him discuss the luminescence and cold pack experiments, and asked him questions about these. Gill spoke and emphasized the "hands-on" nature of the program and her hopes for its success.

One child attending the program was nine year old Dedrick Howell, whose parents enrolled him after receiving the school brochure in the mail. The accident occurred on August 12, 1985. At the beginning of the chemistry class, Jagoe distributed his "recipe" for sparklers to the children and also wrote it on the black board.

**2.** The District of Columbia and The American University were held jointly and severally liable for the injuries to Dedrick, but the District alone was held liable to the Howell parents. The American University settled with appellees after the jury verdict and has not appealed.

**3.** There is some question as to who exactly approved the proposal, but the issue is not relevant to our decision in this case.

Along with other chemical ingredients, the recipe called for the use of potassium perchlorate as the oxidizing agent. Potassium perchlorate was described at trial as an extremely unstable and highly volatile chemical often used to make rocket fuel. Commercially made sparklers are not made with potassium perchlorate.

The children scooped the chemicals, including the potassium perchlorate, out of jars and, using pestles, ground up the mixture in mortars. While they were combining the chemicals, Jagoe ignited three different chemical mixtures at the front of the room with a butane lighter. Butta was present for one of the ignitions when he entered the room to drop off metal hangers for use in the experiment. Mrs. Gill also entered the room at one point, and saw the children working at tables wearing goggles or glasses. She also saw Jagoe at the front of the room lighting the chemicals, with a fire extinguisher on the table next to him. The ignition created what she described as a small "puff" about the size of a baseball, accompanied by a flash of colored light. She testified that she did not know what Jagoe was doing and that he had never mentioned he would do experiments requiring flame or ignition; she associated what he was doing with the luminescence experiment.[4]

The children continued to grind the material while a counselor, Rebecca Seashore, distributed pieces of metal hangers to be dipped into the mixture at a later time. Dedrick Howell was specifically told not to dip the hanger into the material until instructed to do so. Moments later the chemicals exploded in front of Dedrick. The chemicals burned at 5000 degrees fahrenheit, and Dedrick was burned over 25% of his body including his hands, arms, chest, and face. He was rushed to Children's Hospital. His burn treatment in the following months included several stays in hospital and rehabilitation centers, multiple skin grafts, surgery to reopen the scars that constricted his movement and circulation, painful physical therapy that was continued at home, and both in-patient and out-patient psychotherapy.

## II.

■■■ We deal first with the issue of liability. As stated previously, the jury found the District of Columbia liable on alternative theories of negligence, recording its findings on a special verdict form. If the evidence was sufficient to sustain the verdict on any one of these theories, then the denial of the motions for directed verdict and judgment notwithstanding the verdict was proper. *Cf. Nimetz v. Cappadona*, 596 A.2d 603, 606–08 (D.C.1991). Because we conclude that there was ample evidence from which the jury could properly find Jagoe to be an independent contractor performing inherently dangerous work for the District of Columbia, thus making the District vicariously liable for his negligence,[5] it is unnecessary for us to consider the other grounds of liability.

An employer generally is not liable for injuries to third parties caused by an independent contractor over whom (or over whose work) the employer has reserved no control. *Levy v. Currier*, 587 A.2d 205, 209 (D.C.1991). There are exceptions to the rule, however, one of which is that:

> [o]ne who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

---

**4.** Mrs. Gill acknowledged that she had never been in an elementary school classroom where the children were required to wear goggles to do a task. When asked if she was surprised that Jagoe was igniting material in front of eight and nine year olds, which included her own son, she stated that she was not really surprised but was unsure of what was going on.

**5.** The District does not dispute the jury's finding that Jagoe was negligent, or the general principles of vicarious liability on which the jury was instructed.

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 427 (1965)). As both *Levy* and the RESTATEMENT make clear, application of the exception is not limited to intrinsically hazardous work:

It is not ... necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, such as death or serious bodily injury.... It is sufficient that work of any kind involves a risk, recognizable in advance, of physical harm to others which is inherent in the work itself, or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk *under the particular circumstances under which the work is to be done.*

*Levy,* 587 A.2d at 209 (emphasis added) (quoting Comment b to § 427). Hence the doctrine extends to activities which may be dangerous in the circumstances under which they are performed. *See Wilson v. Good Humor Corp.,* 244 U.S.App.D.C. 298, 308–09, 757 F.2d 1293, 1304–05 (1985). The existence of that danger and knowledge of it by the employer are normally questions of fact for the jury. *Levy,* 587 A.2d at 209; *Washington Metro. Area Transit Auth. v. L'Enfant Plaza Properties,* 448 A.2d 864, 868 (D.C.1982) ("[w]hether a particular kind of work is inherently dangerous is essentially a relative determination based upon the facts of the particular case").

In reviewing the denial of a motion for judgment notwithstanding the verdict, we of course examine the evidence in the light most favorable to the prevailing party. *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc). Viewing the evidence in this case in that light, we have no doubt that a jury reasonably could find the required risk of physical harm and knowledge of the risk by the District of Columbia. The jury properly could find that Mrs. Gill, the District's supervisory employee, knew that Jagoe intended to make sparklers with young children as part of the "hands-on" chemistry class.[6] Gill's knowledge existed as early as the August 1st meeting and was confirmed moments before the explosion when she entered the classroom and saw Jagoe igniting chemicals. She therefore had reason to know "of the specific risks likely to arise from the manner in which the contractor performed his assigned [job]." *Wilson,* 244 U.S.App.D.C. at 312, 757 F.2d at 1307. Inherent risk in this situation arose "out of the place where [the work was] to be done," *id.* at 310, 757 F.2d at 1305, namely, an elementary school program involving "hands-on" participation by eight and nine year old children.[7] Just as "[t]he presence of young children is a circumstance that must be taken into account in deciding whether [a defendant's] actions were reasonable and prudent," *Wheeler Terrace, Inc. v. Lynott,* 234 A.2d 311, 312 (D.C. 1967), so it was relevant to whether the District reasonably should have known of the risk entailed by Jagoe's activity. The sparkler experiment combined flammable, combustible chemicals, open flame, and children; for that very reason, presumably, the children had been equipped with goggles. Though sparklers are explosives of a lesser order, conducting controlled explosions is a textbook example of an inherently dangerous activity. *See* RESTATEMENT (SECOND) OF TORTS § 427, comment c (1965). It was not unreasonable for the jury to conclude that the manufacture of sparklers by nine year old children was an inherently dangerous activity.

The District contends that Mrs. Gill hired Jagoe to teach chemistry and that chemis-

---

6. The District contends preliminarily that it was not responsible for hiring Jagoe. But the evidence clearly allowed the jury to find that Mrs. Gill, the District's principal at the Murch School, interviewed Jagoe and reviewed his resume, and that although Butta signed Jagoe's contract of employment, Jagoe could not have been hired without the approval of Mrs. Gill.

7. The trial judge gave the jury considerable guidance on how to decide whether an activity was "abnormally dangerous," noting as just one factor "the inappropriateness of the activity to the place where it is carried on or the extent to which the value of the activity in the community is outweighed by its dangerous attributes."

try classes, in and of themselves, are not inherently dangerous. Even if that is true generally, the jury could fairly reason that placing flammable chemicals in the hands of small children created risks substantially beyond those incident to a normal chemistry class. The District further asserts that there was no evidence that Mrs. Gill could foresee the unorthodox recipe Jagoe intended to use (involving potassium perchlorate), pointing to the expert testimony that standard commercial sparklers (the "good kind") are made with potassium nitrate. But the jury could properly determine that Mrs. Gill had reason to know that making sparklers even with the standard formula was dangerous activity when done directly by small children. Charged with knowledge of that danger, Gill reasonably could have been expected to prohibit the experiment or at least to inquire beforehand about the manner in which Jagoe intended to conduct it.

Therefore, the jury was well within its authority in finding that Jagoe was an independent contractor performing inherently dangerous work of which the District had actual or constructive knowledge.[8]

### III.

■ The trial judge submitted the issue of loss of parent-child consortium to the jury, which returned an award of one million dollars to Mr. and Mrs. Howell. The District contends that the award must be set aside because this jurisdiction does not recognize that claim. Appellees attempt to distinguish precedents binding on this division, and argue at length that we should "affirm the trial court's modernization of the common law claim for loss of services." We agree with the District, however, that the Howells' appeal for recognition of loss of parent-child consortium as a basis for damages must be addressed to the court *en banc*. *Washington v.*

*Washington Hosp. Center,* 579 A.2d 177, 179 n. 1 (D.C.1990); *Pleasant v. Washington Sand & Gravel Co.,* 104 U.S.App.D.C. 374, 262 F.2d 471 (1958). We therefore reverse the damage award for loss of consortium.

■ On the other hand, we reject the District's argument that the admission of evidence related to the loss of parent-child relationship so prejudiced it on liability as to require a new trial on the merits. The District concedes that "some" of this evidence was relevant to its claim of contributory negligence against Mr. and Mrs. Howell (a claim which it dropped in the course of trial). Moreover, the evidence of strain to the family bonds resulting from Dedrick's suffering was relevant to his own compensable pain and suffering.[9] We are not convinced that the evidence adduced on this point was so unrelated to the issues submitted to the jury that a new trial must be ordered.

### IV.

■ The damage award for future medical expenses must likewise be set aside because the award is unsupported by the evidence. Recently we summarized the law concerning proof of damages as follows:

> A plaintiff is not required to prove the amount of his [or her] damages precisely; however the fact of damage and a reasonable estimate must be established. Accordingly, although the plaintiff need not prove damages with mathematical certainty, there must be some reasonable basis on which to estimate damages.

*Garcia v. Llerena,* 599 A.2d 1138, 1142 (D.C.1991) (citations and internal quotation marks omitted); *see also Penny v. Penny,* 565 A.2d 587, 591 (D.C.1989).

Appellees contend that the award for future medical expenses was substantiated

---

**8.** We reject as well the District's alternative argument that the verdict on liability was against the clear weight of the evidence, hence requiring a new trial. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1111 (D.C. 1986) (describing this court's "narrow" scope of review when trial court has denied motion for new trial on this ground).

**9.** The judge instructed the jury that "emotional distress" or "secondary emotional effects" were part of the compensatory damages which could be awarded to Dedrick.

by the following evidence: the documented total of $143,829.45 for past medical expenses; the testimony of Dr. Kurz, Dedrick's treating clinical psychologist, that Dedrick should receive psychotherapy several times a week until age twenty-one; and the testimony of Dr. Randolph, a pediatric surgeon, that Dedrick's scars might require further surgery. The District does not dispute the award for past medical expenses. Those documented expenses stemming from the treatment-intensive period following the accident included repeated surgeries, in- and out-patient psychotherapeutic care, and physical therapy and rehabilitation. But those expenses provided no basis for an estimate of future medical expenses without the additional testimony of Dr. Kurz and Dr. Randolph. We conclude that that testimony was inadequate for reasonably estimating future medical expenses.

Dr. Kurz testified that Dedrick "should have psychotherapy ... probably a couple times a week," and "probably to at least age 21." But Dr. Kurz offered no estimate of the cost of that future therapy, and appellees point to nothing in the record from which the jury could fairly determine the *past* cost to the Howells of psychotherapy in order to allow a meaningful extrapolation to future expenses.[10] Furthermore, although Dr. Kurz had treated Dedrick from February to May of 1986, the Howells had stopped bringing the youngster to counseling two years before trial. Dr. Kurz stated:

> The family stopped coming in. They missed at least one or two sessions before the 6th. The therapy began to peter out, because of their not coming in. According to my records, the last session was the 6th of May [1986], on the 13th they cancelled. They cancelled again on

the 20th. These were weekly sessions. And they didn't show up on the 27th at all. I called and the father said they couldn't come in and that he would call me and they never returned. He never called me, and they didn't come in.[11]

Even if the jury could estimate the cost of bi-weekly therapy, therefore, the likelihood that the Howells would actually incur those expenses rested on a highly speculative foundation.

Nor did Dr. Randolph's testimony provide a factual basis for the award. Dr. Randolph testified that burn patients, particularly during the growth years, "from time to time" need further surgery to relax the construction created by healing scar tissue. But he offered no estimate of how often or until what age this surgery might be needed in Dedrick's case, or even whether it probably will be needed. Moreover, neither Dr. Randolph's testimony nor the medical records furnished a basis for a reasoned estimate of the costs of such future surgery.[12]

In sum, we are constrained to agree with the District's argument in its brief that "there is no basis for an award of damages for future medical treatment, especially when the award for such damages is six times as large as the damages awarded for past medical expenses incurred for nearly seven months of treatment, including lengthy hospitalization requiring round-the-clock medical care." In *Romer v. District of Columbia,* 449 A.2d 1097 (D.C.1982), this court sustained a refusal to instruct the jury on future medical expenses with reasoning that we find pertinent here:

> [S]everal physicians testified about the treatment Romer should undergo in the future. It was suggested that he have

---

10. At oral argument appellees cited to a summary exhibit entitled "Medical Expenses for the Howells" which does not separately list expenses for psychotherapy except for an item of $100.00 for "Child Psychiatry Associates." Dedrick had undergone some thirty days of inpatient treatment in the Psychiatric Ward at Children's Hospital, but the medical records provide no breakdown of the expense of psychiatric counselling so that the jury could estimate the future cost of out-patient therapy. The individ-

ual medical bills from both Doctor Kurz and Children's Hospital were marked for identification, but were never admitted into evidence.

11. For approximately one year between the last therapy visit and trial, the family was living in Africa. They did not seek psychiatric treatment for Dedrick while living there.

12. See note 10, *supra.*

transcutaneous nerve stimulation (TNS), repeated injections into the epidural space, and psychological behavioral counseling (pain clinic) with a continuing rehabilitative program.... No evidence was introduced as to the duration of the suggested treatments, however, and although bills were submitted on the costs of Romer's previous injections and TNS treatment, there was no evidence on the past or future estimated cost of psychological counseling.... Accordingly, as there was no basis upon which the jury could have reasonably calculated or inferred the cost of Romer's future medical expenses, if any, the court correctly refused to allow the jury to speculate in this area of damages.

*Id.* at 1100.[13] The jury's award of future medical expenses in this case rested upon similar speculation.

## V.

 Finally, the District contends that a new trial is necessary because counsel for appellees engaged in improper closing argument, primarily by urging the jury to "tell the District" that its conduct was "wrong" in that it "lur[ed] Dedrick to ... school and never [told] the Howells that [the program was] going to be a hands-on chemistry experiment." The District argues that this and other instances of improper argument were demonstrably prejudicial because the jury, although finding the District and The American University jointly and severably liable as to Dedrick Howell, found the District alone liable for medical expenses and loss of consortium to the Howell parents.

We are unable to draw the District's cited connection between error and prejudice. First, we are not persuaded that the jury was influenced by counsel's variation on the theme of "sending a message." The

trial judge immediately interrupted the argument and told counsel to avoid such argument, which he did thereafter. Later, when counsel for Rebecca Seashore, the student counselor in the classroom at the time of the accident, appeared to make a similar appeal, the court sustained an objection and told the jury: "Disregard the calls of counsel to send a message to any party who is here. Your only duty is to decide whether there is liability and if there is liability." [14] Moreover, it does not follow that in finding The American University liable only to Dedrick but the District liable to the child and his parents, the jury was swayed by prejudice. The only duty of care the University was found to have breached was in controlling or distributing its chemicals, and while Dedrick came in contact with these, the parents did not. Thus the jury's more limited award against the University reflected a permissible allocation of fault.

## VI.

The judgment is affirmed as to liability and the award of damages both for pain and suffering and for past medical expenses. The award of damages for loss of consortium and future medical expenses is reversed.

*So ordered.*

---

**13.** We noted as well that "since Romer [had] refused earlier recommendations of his physicians, he might also refuse to undergo future treatments." 449 A.2d at 1100 n. 4.

**14.** The other claimed improprieties were either permissible characterizations of the evidence or rhetorical excesses which "the jury likely had the good sense to disregard." *Dyson v. United*

*States,* 450 A.2d 432, 438 (D.C.1982). The trial judge did not agree, nor do we, that the reference to the Spinks–Tyson boxing match (apparently discussed in the newspaper the previous day) was a suggestion "to the jury that it award a specific dollar amount." *District of Columbia v. Colston,* 468 A.2d 954, 957 (D.C.1983).