### Deloris GILES, Appellant,

v.

### SHELL OIL CORPORATION, Appellee.

### No. 83–1450.

District of Columbia Court of Appeals.

Argued Sept. 19, 1984.

Decided Feb. 8, 1985.

---

Peter C. DePaolis, Landover, Md., with whom Charles R. Richey, Jr., Washington, D.C., was on the brief, for appellant.

Brian W. Shaughnessy, Washington, D.C., for appellee.

Before MACK, NEWMAN and TERRY, Associate Judges.

MACK, Associate Judge:

On appeal appellant argues that the trial court's grant of summary judgment to appellee should be reversed. Specifically, appellant contends a material factual dispute exists concerning appellee's degree of control over and knowledge of acts of its lessee and his employees. We disagree and therefore affirm.

Appellant's son was fatally shot by a Shell Oil service station attendant on December 6, 1980. The gun used in the shooting had been entrusted to the attendant by the station manager. Some three weeks earlier, the attendant shot a hole into the station ceiling while playing with the gun. Appellee was notified of the damage and a work crew was sent to repair the ceiling at no cost to the station. The work crew was advised of how the damage was done. Based upon these factors, as well as other factors discussed *infra*, appellant initiated suit against appellee under the doctrines of respondeat superior and/or negligent hiring and supervision.[1]

■ In order to succeed under the respondeat superior theory of liability, appellant must show that a master-servant relationship existed between the station attendant and appellee, and that the incident at issue occurred while the attendant was acting within the scope of his employment. *Murphy v. Army Distaff Foundation, Inc.*, 458 A.2d 61, 63 (D.C.1983).

In *LeGrand v. Insurance Co. of North America*, 241 A.2d 734, 735 (D.C.1968) (quoting *Dovell v. Arundel Supply Corp.*, 124 U.S.App.D.C. 89, 90, 361 F.2d 543, 544, *cert. denied*, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966)), the court enumerated factors to be considered in determining whether a master-servant relationship exists: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."

The determination of the existence of the relationship basically turns upon one of these factors: control.

[W]hile it is said that at common law there are four elements which are considered upon the question whether the relationship of a master and servant exists ... the really essential element of the relationship is the right of control, that is the right of one person, the master, to order and control another, the servant, the performance of work by the latter, and the right to direct the manner in which the work shall be done.

53 AM.JUR.2d *Master and Servant* § 2 (1970). *See also Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C.1982).

Appellant points to numerous factors which she deems to be indicia of control, namely that appellee: (1) owned the service station; (2) paid for repairs done on the premises (including the ceiling repair necessitated by the prior discharge of the shotgun); (3) set standards by which the station was to be operated; (4) had a right to inspect the station; and (5) had the right to terminate the agreement if the operator either failed to maintain the premises according to appellee's specifications or failed

---

1. The appellant settled with the station operator. The station manager never retained counsel or filed any responsive pleadings. Brief for Appellant at 2 n. 1.

to maintain Shell Oil products in stock for resale for a specified period of time. We cannot agree with appellant that these factors are sufficient to subject appellee to liability under the theory of respondeat superior.

In *Safeway Stores, Inc. v. Kelly, supra,* 448 A.2d at 856, we addressed the issue of the degree of control required to establish a master-servant relationship. The basic issue in *Safeway* was whether appellant (Safeway) was liable under a theory of respondeat superior for the actions of a security guard employed in one of appellant's stores.[2] We held there that appellant was vicariously liable for the guard while he was acting within the scope of his employment, because appellant, through its manager, had the right to control the guard's day-to-day performance, and the right to replace the guard.

In *Safeway*, the store manager had operational control over the guard. He normally set the hours the guard worked. *Id.* at 859. Testimony elicited during the trial showed the guard would occasionally lock the doors at the manager's request and would act under the store manager's general direction if there was a problem with a customer. The guard was also directed to keep juveniles from the doorway and to watch for shoplifters. *Id.* at 861. The general impression created by these facts is that the manager identified specific problems and directed the guard to those problems. *Id.* at 861. In other words, the manager controlled the guard's day-to-day performance.

■ The undisputed evidence in this case is not similarly dispositive. Appellee did, as appellant contends, own the service station, pay for repairs, grant or deny approval before alterations on the premises were made, and have the right of inspection. Appellee did not, however, have the right to control the day-to-day operations of the station and its employees or the right to terminate those employees. As the court noted in *Safeway, supra,* 448 A.2d at 861 (citing *Adams v. F.W. Woolworth Co.,* 257 N.Y.S. 776, 780, 144 Misc. 27, 30–31 (Sup. Ct.1932)), "no single fact is more conclusive of a master and servant relationship than the unrestricted right of the employer to terminate the employment whenever he chose."

Here the undisputed respective rights and liabilities of the parties, including those relied upon by appellant, are set out in the contracts between them, *i.e.,* in the Motor Fuel Service lease and the Dealers Agreement.

Appellee points to the following provision in the lease as one negating control:

LESSEE'S BUSINESS. Nothing in this lease shall be construed as reserving to Shell any right to *exercise any control over, or to direct in any respect the conduct or management of, the business* or operations of Lessee on the premises; but the entire control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this Lease. Neither lessee nor any person performing any duties or engaged in any work on the Premises for or on behalf of Lessee shall be deemed *an employee or agent of Shell,* and none of them is authorized to impose on Shell any obligations or liability whatever. [Emphasis added.]

The language of the Dealer Agreement is similarly advanced as limiting control:

Dealer's Independence. Dealer is an *independent businessman* and nothing in this agreement shall be construed as reserving to Shell any right to *exercise any control* over or to *direct in any respect the conduct or* management of dealer's business or operations. [Emphasis added.]

Finally, appellee points to the deposition of the station operator that appellee exercised no control over his employees.

2. The security guards were hired by Safeway from Seaboard Security Systems, Ltd.

We recognize that "[t]he legal relationships arising from the distribution systems of major oil-producing companies are in certain respects unique." *Hoover v. Sun Oil Co.*, 8 Storey 553, 58 Del. 553, 212 A.2d 214, 215 (Del.Super.Ct.1965). And as such, traditional definitions of master-servant, principal-agent are often difficult to apply. *See id.* But when, as here, it is clear that appellee did not exercise, through either contract rights or custom, control over the station's day-to-day operations, it cannot be said a relationship sufficient to support imposition of vicarious liability existed.

The factors to which the appellant points—the right to inspect, the right to set standards by which the station operated, etc.—are not indicia of control. They in no way indicate that appellee had the right to control the day-to-day operation of the station or the day-to-day performance of its employees. Rather, the factors pointed to by appellant are indicative of a contractual relationship between the parties. We agree with appellant that the parties' actual relationship, in spite of contractual language, may be the conclusive factor. However, there is nothing in the facts of this case, unlike those in *Safeway, supra,* to indicate that any rights ascribed to, or actions taken by, appellee went beyond the bounds of a purely contractual relationship.

In so concluding, we find language from *Shell Oil Co. v. Leftwich,* 212 Va. 715, 721, 187 S.E.2d 162, 168 (1972), to be instructive.

> [The station operator], having leased the service station from Shell, was in complete possession and control thereof. He hired and fired employees at will and otherwise conducted the business of a service station operator and garageman. He was an independent contractor.... Manifestly, Shell, as [the station operator's] landlord, and as a seller of gasoline to him, was concerned with the manner in which the station was conducted and with the success of the venture. Having determined to market its gasoline through independent dealers throughout the United States, Shell had a stake in the type of dealers that rented its stations and purchased its products and in the attractiveness of the stations they operated. [And thus 'an interest in repairing the ceiling damaged by the shotgun blast in the instant case.] The good will and benefit which Shell envisioned from its marketing policy of having local, independent dealers retail Shell products could well be dissipated by unattractive stations or inefficient operations.... Hence Shell had its representatives inspect the stations it leased to dealers, and advise with dealers from time to time. *This conduct* did not alter the status of a *dealer* as an *independent contractor* ... [emphasis added].

We turn briefly now to appellant's alternative theory of liability: negligent hiring or supervision. To invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee. *See Murphy v. Army Distaff Foundation, Inc., supra.* Having determined that a master-servant relationship did not exist in this case, we can only conclude that this alternative theory of liability will not lie. The attendant who fired the fatal shot was not an employee of Shell.

There is no disputed issue of a material fact and the law applicable to the facts is clear. The trial court properly granted summary judgment in favor of appellee.

*Affirmed.*