628 So.2d 1143 (1993)
Joan BOHMFALK, Arthur William Bohmfalk and Margaret Jane Lynch
v.
CITY OF NEW ORLEANS and Jan Porretto.
No. 93-CA-0821.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1993.
*1144 Donna S. Cummings, Richard M. Martin, Jr., Cummings, Cummings & Dudenhefer, New Orleans, for Joan Bohmfalk, Arthur William Bohmfalk and Margaret Jane Lynch.
Kathy L. Torregano, City Atty., George Blair, Chief of Criminal Justice, Michael G. Riehlmann, Delores B. Vanison, Asst. City Attys., New Orleans, for City of New Orleans.
Before BYRNES, WARD and PLOTKIN, JJ.
WARD, Judge.
Mrs. Joan Bohmfalk and her children, William Arthur Bohmfalk and Margaret Jane Lynch, sued the City of New Orleans and former police officer, Jan Porretto, claiming damages for the murder of her husband and their father, Dr. Bohmfalk, by Porretto. Mrs. Bohmfalk also claims damages from both the City and Porretto for a battery Porretto allegedly inflicted on her. In a criminal trial Porretto was convicted in Jefferson Parish of second degree murder of Dr. Bohmfalk, and battery of Mrs. Joan Bohmfalk. In the civil trial in Orleans Parish the trial judge rendered judgment in favor of the City of New Orleans, holding that the City, as employer of former police officer Jan Porretto, was not liable for Dr. Bohmfalk's death. Plaintiffs have appealed that ruling, claiming that the trial court erred in ruling for the City, and they also point out that the trial court neglected to render judgment in their suit against Porretto.
*1145 Plaintiffs base their claim on two grounds: (1) The City of New Orleans is vicariously liable for the tortious acts of Jan Porretto committed while he was a New Orleans Police Officer, under La.C.C. art. 2320respondeat superior. (2) The City of New Orleans is directly liable under La.C.C. art. 2315 for its own negligent actsnegligent hiring, negligent retention, and failure to discover that Porretto was unfit to be a police officer. The facts are uncontested by the City.
On the evening of September 13, 1979, Mrs. Joan Bohmfalk, along with her daughter and son-in-law, attended a stage show in the Blue Room at the Fairmont Hotel in New Orleans. Around 2:30 a.m. they returned to Kenner and Mrs. Bohmfalk drove her daughter and son-in-law home, then returned to her residence for the evening. Mr. Bohmfalk was not at home when she arrived.
At about 5:00 a.m., Mrs. Bohmfalk was awakened by her dogs barking and the doorbell ringing. She went downstairs, and saw at the door a white male dressed in a green "scrub shirt" who identified himself as an assistant coroner and asked to be let in. After entering the home the man informed Mrs. Bohmfalk that her husband had committed suicide. Mrs. Bohmfalk became hysterical and went upstairs to put on a robe and call her daughter. The man followed her upstairs and when she attempted to dial the telephone he began beating her. When she regained consciousness, she was able to dial the operator who called an ambulance. She was taken to the hospital and later released without further complications.
It was later determined that during the early evening hours of September 13th, while Mrs. Bohmfalk was at the Blue Room, Dr. Bohmfalk left home and went to a bar in Metairie. The bartender there testified that he saw Dr. Bohmfalk and Jan Porretto drinking together. Dr. Bohmfalk was not seen again.
About 7:00 a.m. the next day Detective Russell Hidding of the Jefferson Parish Sheriff's Office was assigned to investigate a possible homicide, when a body was found in the Knights of Columbus's parking lot in Metairie. There was no wallet or identification on the body but it was identified as the body of Dr. Bohmfalk. During the autopsy, Detective Hidding recovered a .38 caliber projectile. The coroner concluded that the victim died of a single gunshot wound to the head. From the path of the projectile he concluded it was a homicide rather than a suicide.
No progress was made in solving the murder of Dr. Bohmfalk or the aggravated battery of Mrs. Bohmfalk until July, 1980 when Detective Hidding of Jefferson Parish received an anonymous letter which had been forwarded to the Jefferson Parish Sheriff's Office. Based on the information in the letter, Detective Hidding obtained a photograph from the personnel files at the New Orleans Police Department, and Mrs. Bohmfalk made a positive identification of Jan Porretto. Porretto was subsequently arrested and charged with first degree murder.
Through the combined efforts of the Jefferson Parish Sheriff's Office and the New Orleans Police Department it was determined that the .38 pellet recovered from Dr. Bohmfalk's body was fired from the same weapon Porretto used in two "off duty" shootings while he was employed as a New Orleans police officer.

VICARIOUS LIABILITY
Plaintiffs' claims of vicarious liability are based on Civil Code Article 2320 which provides that an employer is liable for the tortious acts of its employees in the exercise of the functions in which they are employed. In LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974) the Supreme Court further defined vicarious liability. An employer may be liable for the tortious acts of an employee if those acts are so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. See also *1146 Kogos v. Payton, 522 So.2d 1198, 1200 (La. App. 4th Cir.1988) in which this court applied this test to find an off-duty deputy engaged in a barroom brawl outside the scope of employment.
Applying the LeBrane test to the instant case, we find that Porretto's criminal act is not connected with the City's business, and it cannot be fairly attributable to the City's business of crime prevention. It was unquestionably "motivated by purely personal considerations entirely extraneous to the employer's interest." The "time" of the murder was hours after Porretto's employment duties had ceased. The "place" was outside the City, where the City had no jurisdictional interest. The "causation" or motive for Porretto's criminal conduct was purely personal and unrelated to his employment duties.
Plaintiffs, however, argue that the City's Police Department encouraged Porretto to carry a weapon 24 hours a day, and they contend that because of this policy that Porretto carried a gun and was able to commit this robbery/murder, a cause-in-fact of Dr. Bohmfalk's death. While it is true that the NOPD rules seem to encourage this, a close reading of those rules and regulations indicate that Porrettoand every off-duty police officerwas allowed, not required, to carry a weapon, obviously permitting them to respond to emergency situations in New Orleans. This however, cannot be translated to authority to carry weapons outside New Orleans, nor encouragement of it, because they could not act as officers in another jurisdiction, such as Jefferson Parish. The City, thus, would have no interest in having off duty police officers carry weapons where they could not serve the City. Accordingly, we agree with the trial court's finding that Porretto was not exercising any function for which he was employed, and therefore, the City is not vicariously liable under Civil Code Article 2320.

NEGLIGENCE OF THE CITY OF NEW ORLEANS
Plaintiffs also argue that the City itself was negligent by negligently hiring Porretto as a police officer and negligently retaining him after it was apparent that he was unfit to serve. The trial court made a finding of fact that the City was not negligent, and because that finding is not manifestly erroneous, we affirm.
The record reveals that Jan Porretto compiled a relatively positive work record with the New Orleans Police Department from the year 1971 until 1977. During that span, Porretto received eight awards of commendation and other citations for exemplary performance. Within the same time, however, Porretto received five reprimands for on-duty incidents. Porretto's work record from 1977 until his resignation from the police force on December 11, 1979 showed a dramatic rise in the number of violent incidents he was involved in, particularly while off-duty.
At least three of the incidents were investigated by the NOPD, but in each case investigators concluded that disciplinary action was not warranted or that disciplinary action could not be sustained in a Civil Service Review. Rather, the record shows that in each case there was some justification, which, while certainly questionable, supports the investigator's conclusions. (See Appendix A).
Plaintiff's argument that the City acted negligent by hiring Porretto is simply not supported by the evidence. When the City hired Porretto in 1971 there was no indication that Porretto was unfit to serve as a police officer. Plaintiffs may speculate about psychological testing, but it was not available then, and even so, Porretto's first years were exemplary which would indicate that when he was hired he was fit to serve.
Plaintiffs' argument that the City was negligent to retain Porretto after his "unusual" off-duty conduct does not have merit, because, as we have indicated, NOPD investigations did not produce grounds for disciplinary action, much less termination of employment. While plaintiffs infer that the City did nothing, as a matter of fact, NOPD took some action, it transferred Porretto from the field to central lockup.
However, even if we assume that the City was somehow negligent for retaining Porretto *1147 as a police officer, plaintiffs have not proven causation. In a similar case, Roberts v. Benoit 605 So.2d 1032 (La.1992), the Supreme Court ruled that Sheriff Foti could not be held liable for an injury caused by an intoxicated off-duty commissioned deputy that shot a friend while engaging in horseplay. The Court in Benoit found that causation was not proven and that plaintiff had not produced evidence to show it was more probable than not that but for Sheriff Foti's negligence, Benoit would not have been injured. The facts herein are not as favorable to plaintiffs as in Benoit, because unlike Benoit where the homicide occurred in New Orleans, Porretto was not a peace officer in Jefferson Parish. Therefore, retaining Porretto as a police officer in New Orleans has either little or no connection with his acts in Jefferson, where he had no authority to act as a peace officer. In any event, it was not a "substantial factor" that can be said to be a cause-in-fact of either Dr. Bohmfalk's death or Mrs. Bohmfalk's injuries.
Under Civil Code Article 2315 and a duty-risk analysis, the first inquiry is whether the conduct in question is a cause-in-fact of the harm which occurred. This inquiry is a question of fact, not subject to reversal unless manifestly erroneous, and in this case the trial court found that the City's negligence, if any, was not a cause-in-fact of Dr. Bohmfalk's death nor of Mrs. Bohmfalk's injuries. The trial court observed that removing Porretto from duty would not have eliminated Porretto's access to guns, that the gun used to murder Dr. Bohmfalk was a gun owned by either his father or brothers, although it was the same gun used in other off-duty shootings. Therefore, we do not find any merit to plaintiffs' argument that but for the City's failure to remove Porretto from duty, Dr. Bohmfalk probably would not have been murdered nor Mrs. Bohmfalk injured. At any rate, based on the record, we cannot say that the trial court's finding is manifestly erroneous, and the trial court correctly ruled that plaintiffs' cannot recover under Civil Code Article 2315.
The trial court neglected to rule as to plaintiff's claims against Jan Porretto, and we remand to the trial court for an expeditious disposition of those claims.
AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.

APPENDIX A
On June 18, 1978, Porretto and Ralph Mounicou, another officer with the New Orleans Police Department went to the Hyatt Regency Hotel to have breakfast. Both officers were off-duty and in street clothes when they were approached by Isaiah Mitchell, who offered to sell them some cocaine.
Porretto produced his N.O.P.D. credentials and informed Mitchell that he was under arrest. Porretto stated that when he started to frisk Mitchell, Mitchell attempted to wrestle the revolver away from him. The gun discharged and Mitchell was struck in the chest area with a projectile from Porretto's.38 Smith & Wesson revolver.
The investigators found at the scene of the incident a metal tin containing foil wrapped packets of a white powder. The investigators noted Mitchell's extensive arrest record, and the fact that he was wanted for armed robbery in Memphis, Tennessee. There was no evidence to contradict Porretto and Mounicou's account of the incident and the investigators concluded that the shooting was justified.
After the incident, Porretto admitted to having drank one or two beers prior to the shooting. Ralph Mounicou was administered a polygraph examination as a result of street sources giving accounts of the incident in direct contravention to the Porretto account. The test examiner gave his opinion that Mounicou testified falsely, and that he withheld information concerning the incident. The results of the Mounicou polygraph examination were communicated to James Parsons, then Superintendent of Police, by the Commander of the Homicide Division via a confidential memorandum. The results were forwarded to the Internal Affairs division which conducted an interview with Porretto concerning the incident. When asked to submit *1148 to a polygraph examination, Porretto refused and nothing further came of the incident.
On June 26, 1978, a little more than a week after the Mitchell shooting incident, Porretto, while off-duty, entered a homosexual bath house called the Canal Baths, located at 730-740 North Rampart Street. He conducted a raid charging that 7 patrons offered to perform unnatural sexual acts. A memorandum addressed to the Superintendent of Police from the Internal Affairs division detailed the statements given by Porretto, the arrested subjects and the officers called to the scene.
The arrested men made allegations that Porretto attempted to get someone to perform a homosexual act upon him. Other allegations stated that Porretto attempted to have sex with some of the patrons. One patron stated that he actually performed an act of oral copulation upon Porretto. Two patrons alleged that Porretto hit them. However, a polygraph examination was administered to three of the complainants and Porretto. The examiner determined that the complainants were untruthful in their allegations and that Porretto had not engaged in sexual activity with any of the patrons at the Canal Baths. The polygraph examination also showed that Porretto was untruthful in his report to the extent that he may have been attempting to cover up some of his actions and that he may have falsely arrested some of the patrons. Since both sides were found to be untruthful, the NOPD found the allegations were not substantiated.
On April 29, 1979, Porretto was involved in a shooting incident at Lucky Pierre's Restaurant and Lounge located at 735 Bourbon Street in the Vieux Carre.
Porretto and another officer, Anthony Genovese were in Lucky Pierre's, to get breakfast, when a fight broke out between two patrons. Both Porretto and Genovese were off-duty and dressed in street clothes. Porretto and Genovese broke up the fight, identified themselves as police officers, and ordered both men to leave the bar.
One man, who was later identified as Harlan P. Reynolds, returned to the bar and threatened to "shoot up the place." The barmaid told Porretto and Genovese that Reynolds had a gun. When they approached him, Reynolds reached into his waistband and removed a small automatic weapon, whereupon Porretto fired several shots and killed him.
After interviewing the barmaid and several other witnesses in the bar and taking statements, the investigating officers found nothing to contradict Porretto or Genovese, and the Department concluded that the shooting was justified.
On Monday, December 10, 1979, the Police Department received a complaint from a woman in Metairie, who stated that Police Officer Jan Porretto arrived at her home, identified himself as a New Orleans Police Officer, and asked for her husband. The complainant became alarmed and asked Porretto to leave because he appeared to be drunk. Once outside Porretto flashed his I.D., stated his name and got into an unmarked police vehicle and left.
When she telephoned in her complaint, the witness identified Porretto by name, and gave the vehicle license number.
The Police Department attempted to contact Porretto, who finally showed up at 5:30 p.m. that day, and stated that he was looking for a person who owed his father some money. He admitted to drinking and taking a Police Department vehicle. Porretto was suspended for violating departmental rules.
He was ordered to return to the office the next day, December 11, 1979 at 10:00 a.m. to give an additional statement concerning his AWOL status the previous Friday.
Porretto finally arrived at 1:00 p.m. that day and tendered his resignation from the New Orleans Police Department. Upon resignation, the Department's investigation into the complaint was terminated.