Karen PHELAN, et al., Appellants,

v.

CITY OF MOUNT RAINIER and its Chief of Police, John Thompson, Appellees.

No. 98–CV–1096.

District of Columbia Court of Appeals.

Argued June 7, 2000.

Decided Aug. 22, 2002.

Mark D. Johnson, with whom Wade J. Gallagher was on the brief, for appellants.

David B. Stratton, with whom Teresa W. Kenney was on the brief, for appellees.

Before WAGNER, Chief Judge, FARRELL, Associate Judge, and BELSON, Senior Judge.

WAGNER, Chief Judge:

Jeffrey Phelan was shot and killed on the steps of his home in the District of Columbia by Wesley Thompson, then an off-duty police officer with the City of Mount Rainier, Maryland. Appellant Karen Phelan, decedent's widow, individually and as personal representative of the decedent's estate, and to the use of decedent's parents, Donna and Michael Phelan (collectively "Appellant"), filed a complaint un-

der the Wrongful Death and Survival Acts and for civil rights violations against Wesley Thompson, individually and as a Mount Rainier police officer, Mount Rainier Police Chief John Thompson ("Police Chief") and the City of Mount Rainier, Maryland and its police department (collectively "the City"). Appellant alleged in the complaint that Wesley Thompson killed decedent with his service revolver in a dispute involving Mrs. Phelan and Dean Reed, who was Thompson's roommate and Mrs. Phelan's former husband. Appellant sued Reed and Wesley Thompson for assault, threats, and intentional infliction of emotional distress. She asserted claims against the City and its Police Chief for violation of decedent's civil rights under 42 U.S.C. § 1983, negligent entrustment of Officer Thompson with a dangerous weapon, and common law claims of negligent hiring, supervision, training and retention of the officer. Appellant withdrew her claims for negligent hiring and training, and the trial court granted summary judgment for the City and the Police Chief on the remaining claims.

On appeal, appellant challenges the trial court's ruling only with respect to the claims of negligent supervision and retention and negligent entrustment of a firearm.[1] She concedes that the Police Chief should be dismissed from the action as he was a named defendant only in the dismissed civil rights claim for which she did not file an appeal.[2] Appellant also argues that the trial court erred in denying her motion to compel production of the police complaint log book filed against Officer

Thompson and the police. We hold that while negligent supervision and retention claims may be maintained as direct theories of liability, on this record, the trial court properly found that the City is entitled to judgment as a matter of law. Further, we hold that appellant failed to show that she could establish the essential notice or proximate cause requirement for maintaining a negligent entrustment claim. Finally, we conclude that the trial court did not abuse its discretion in denying appellant's motion to compel production of police logs.

## I.

### A. *Factual Background*

According to a written statement given by Wesley Thompson, his roommate Dean Reed informed him that on April 6, 1993, he wanted to take possession of a vehicle, which he still owned with his former wife, Karen Phelan, to use it as a bargaining tool to secure the return of his property. Thompson advised Reed that it was not illegal to take one's own property.[3] Thompson and Reed then drove to the Phelans' home, where Thompson, using Reed's key, drove the car around the corner and gave it to Reed. Thompson then advised Reed that he needed to notify Mrs. Phelan so that she would not report the car stolen. At his deposition, Thompson testified that on the night of the shooting, he accompanied Reed in order to explain the situation in case Mrs. Phelan called the police and complained that Reed was a trespasser or acting disorderly. They

---

1. Appellant stated that she is not appealing the dismissal of the § 1983 claims.

2. The record reflects that a default was entered against Dean Reed in the trial court. Appellant states in her brief that she dismissed her claims against Wesley Thompson and that neither he nor Reed are parties to this appeal.

3. Thompson admitted that he used his police authority to verify whether the car was still registered to Reed. Thompson called the Mount Rainier police station and "asked them to run a plate for me."

went back to the Phelans' residence after taking the car, and Mr. Phelan came outside. Mrs. Phelan came to the door and was talking to Reed in the doorway. Thompson said he was standing near a tree. According to Thompson, he noticed Mr. Phelan, who was standing midway down the front steps, putting his hand in his pocket as the conversation became heated between Reed and Mrs. Phelan. Thompson testified that he said to Mr. Phelan "something to the effect, like, 'hey, shorty,' and . . . got his attention . . . 'why don't you take your hands out of your jacket,' " in an attempt to "de-escalate" the situation. Mr. Phelan responded, saying among other things, " 'I am not playing around,' sort of a finalized-type thing, and that is when he started to draw his hand out of his jacket." Thompson testified that he reacted by drawing his weapon from the holster inside of his windbreaker. He did not see Mr. Phelan with a weapon when he began drawing his gun, but he saw decedent's gun "during my draw, I guess." Thompson testified that he fired the weapon instinctively when he saw Mr. Phelan pointing a gun at him.

Reed corroborated Thompson's account of how they came to be at the Phelans' home on that fatal night. He stated that after getting the car, they decided to drive back to speak to Mrs. Phelan in person. Reed said that he brought Thompson with him because he was expecting a fist fight. Reed stated that he knocked on the door while Thompson remained on the sidewalk. Mr. Phelan answered the door, and Reed asked to talk to Mrs. Phelan. When Mrs. Phelan came to the door, Reed asked for his belongings back, and Mrs. Phelan responded that she wanted her car back.

Reed then heard decedent tell Thompson, "I am not fucking around," as decedent reached into the left side of his coat at waist level. "His arm started to move back from his coat, his elbow was raising away, that's when I heard gunfire." Reed stated that he observed Thompson shoot Mr. Phelan, and saw Mrs. Phelan run inside when the shooting started. After decedent fell to the steps, Thompson pulled out his badge and told the neighbors to call the police and a medic. Reed stated that he saw decedent's gun for the first time after he was shot when the gun was lying by his right side. When the police officers arrived, they picked up the gun and moved it away from decedent.

Mrs. Phelan's version of the shooting differed in material respects from Thompson's and Reed's. According to Mrs. Phelan's deposition testimony, on the night of the shooting, she came to the door and told Reed to

> go get the car and bring the car around. I told him that I had called the police and the police were going to come and arrest him, that he was going to get into trouble. And he put his hands up like this and he said 'I've got all my bases covered because I'm a cop too.' And I thought that was a very strange thing for him to say because I didn't know he was a cop.

> And when he said that, [decedent] turned and looked at me with a strange expression on his face like what is he talking about. And just as [decedent] turned and looked at me—just before he turned back around, Mr. Thompson came out from behind the tree.[4]

4. In her answers to interrogatories, Mrs. Phelan stated that Thompson shot decedent eleven times without provocation and an adequately screened police officer who was properly trained does not travel out of his jurisdiction with his service revolver to resolve a dispute between his roommate and the roommate's former wife by shooting the former wife's husband dead.

Mrs. Phelan testified that when Thompson came from behind the tree, Mr. Phelan told him to "show me what you have behind your back." Thompson responded, "you come down here where I can see you better." Mr. Phelan repeated his request. Mrs. Phelan testified that Thompson then pulled out his gun and "spread his legs in a police stance" and shot Mr. Phelan once. She testified that Thompson did not draw his gun from his holster, but in fact "had it at the ready." She said that Thompson paused and then shot decedent two more times, and paused again and shot him repeatedly. She testified that after the shooting, Thompson told the neighbors that he was a police officer.

Thompson testified that he knew that he had "no police authority inside Washington, D.C." Thompson acknowledged that, although he was not prohibited from carrying his weapon outside of his jurisdiction while off-duty, it is not Mount Rainier's policy to require officers to carry their weapons off-duty at all times. Thompson said that he never told anyone at the scene that he was a police officer. Thompson stated that he never intended to go to Mrs. Phelan's house in his official police capacity.

### B. *Procedural Background*

The City and the Police Chief filed a Motion to Dismiss based upon appellant's failure to give notice of the claims pursuant to Maryland's Local Government Torts Claims Act (LGTCA). Initially, the trial court (Judge Bayly) granted the motion, but reconsidered its ruling and reinstated the tort law causes of action.[5]

The City, the Police Chief and the Police Department moved for summary judgment, contending that appellant failed to meet her burden of proof necessary to sustain a claim under § 1983. Specifically, they contended that the evidence failed to show that Officer Thompson was acting within the scope of his employment or that the City's actions were responsible for the injury and death of the decedent. In opposition to the motion, appellant conceded that Officer Thompson was not acting within the scope of his authority when he shot Mr. Phelan. However, appellant maintained that Officer Thompson was acting under color of law, and she contended that she had demonstrated that "the City acted with deliberate indifference when it supervised and retained Wesley Thompson." She contended that the police department was on notice of Officer Thompson's misconduct but failed to respond to it or responded inadequately and continued to entrust him with a dangerous weapon and police authority, which ultimately resulted in decedent's death. In her statement of material facts in dispute, appellant

---

**5.** In the trial court, in its only jurisdictional challenge, the City moved to dismiss the complaint on the ground that appellant failed to provide notice of her claim within 180 days as required by the Maryland Local Government Tort Claims Act, MD.CODE ANN., CTS. & JUD. PROC. § 5–404 (1987, 1997 Repl.Vol.), presently codified as § 5–304 (2001 Repl.Vol.) (LGTCA). Although the court granted the motion initially, it denied it upon reconsideration, concluding that police reports and attendant documents provided sufficient information to meet the statutory notice requirements under District law and the good cause showing exception set forth in the LGTCA. *See Pitts v. District of Columbia*, 391 A.2d 803, 806–09 (D.C.1978); *see also Williams v. Montgomery County*, 123 Md.App. 119, 716 A.2d 1100, 1104–07 (1998), *aff'd sub. nom.*, 359 Md. 379, 754 A.2d 379 (2000). The City did not note an appeal, but challenges this ruling in its brief. In addition, for the first time on appeal, the City claims that appellant's claims are barred by the doctrine of governmental immunity and/or public official immunity. It contends that these defenses are jurisdictional and may be raised at any time. In light of our disposition of this case, we need not resolve these issues. *See Childs v. United States*, 760 A.2d 614, 617 (D.C.2000), *cert. denied*, 532 U.S. 1068, 121 S.Ct. 2221, 150 L.Ed.2d 213 (2001).

dismissed the claims of "negligent hiring and training under the common law counts as well as under the § 1983 claim." However, she stated that she was continuing to pursue the claims of negligent supervision and retention, negligent entrustment of a firearm, and the § 1983 claim as to supervision and retention.

The trial court (Judge Zeldon) granted the motion for summary judgment. As to the § 1983 claim, the court concluded that the undisputed facts showed that Officer Thompson was not acting under "color of any statute, ordinance, regulations, custom or usage of any State [*i.e.*, Maryland]." Therefore, the court found it unnecessary to determine whether any government custom or policy could have been the moving force behind the shooting. The court granted the motion on alternative grounds that the evidence was inadequate to permit a jury to find that the City's alleged failure to train and terminate Thompson reflected conscious disregard of an obvious risk that he would misuse his weapon. As indicated, note 1, *supra*, appellant is not appealing the dismissal of the § 1983 claim.

Since appellant conceded that Thompson was not acting within the scope of his employment at the time of the shooting, the trial court granted summary judgment for appellees on the claims of negligent supervision, negligent retention and negligent entrustment of a firearm. Further, the court stated that appellant had failed to provide any persuasive legal authority that she could prevail on these claims on a "direct liability theory," assuming there was factual support for the claims. Appellant appeals from this ruling and from an order of the trial court (Judge Rankin) denying her motion to compel production of the complaint logs maintained by the City.

## II.

Appellant argues that the trial court erred in granting summary judgment. She contends that causes of action for negligent supervision and retention are viable even where the employee who causes the injury is acting outside the scope of his employment. Further, she argues that there was disputed evidence of material facts requiring submission to a jury of the claim of negligent entrustment of a firearm and the issue of proximate cause.

### A. *Summary Judgment Standard of Review*

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Morgan v. Psychiatric Inst. of Washington,* 692 A.2d 417, 420 (D.C.1997) (citing *Nader v. de Toledano,* 408 A.2d 31, 41 (D.C.1979) (quoting Super. Ct. Civ. R. 56(c)). In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, who "is entitled to 'all favorable inferences which may reasonably be drawn from the evidentiary materials.'" *Hendel v. World Plan Executive Council,* 705 A.2d 656, 660 (D.C.1997) (quoting *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 198 (D.C.1991)). On appeal, this court conducts an independent review of the record and applies the same substantive standard as the trial court. *Id.* (citing *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C. 1994)).

### B. *Negligent Supervision and Retention*

Appellant concedes that Officer Thompson was not acting within the scope of his employment when he shot and killed Mr. Phelan and that, accordingly, no theory

of the City's liability under *respondeat superior* is available to her. She argues, however, that the claim for negligent supervision, retention and entrustment of a firearm are viable causes of action against an employer as direct theories of liability. She contends that proof that the employee acted within the scope of employment is not necessary to impose liability on the employer in the circumstances presented here.[6]

It is well established that an employer may be held liable for the negligent acts of an employee under the doctrine of *respondeat superior*. *District of Columbia v. Coron*, 515 A.2d 435, 437 (D.C.1986) (citing *Boykin v. District of Columbia*, 484 A.2d 560, 561 (D.C.1984)) (other citations omitted). We have declined to hold an employer liable vicariously for the intentional torts of an employee committed solely for the accomplishment of his own malicious personal reasons. *See id.* at 438;[7] *see also Sebastian v. District of Columbia*, 636 A.2d 958, 960 (D.C.1994). Appellant makes no challenge to these general principles. However, she contends that they do not control here because she relies upon the separate and distinct theory of direct liability for negligent supervision and retention and negligent entrustment of a firearm.

There are circumstances under which an employer can be held liable for intentional acts committed by an employee who causes harm, although acting outside the scope of his or her employment. That liability is predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence. *See, e.g., Morgan, supra*, 692 A.2d at 423; *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.1985); *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 63 (D.C.1983); *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C.1951). When the employer itself breaches a duty of care which proximately results in injury to a third party, "the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment." *Fleming*, 80 A.2d at 917. To establish a cause of action for negligent supervision, a plaintiff must show: that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with

---

**6.** The City argues that appellant did not brief the issue of negligent entrustment of a firearm in the trial court, and therefore, has waived the argument. *See Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 349 n. 6 (D.C.1987) (failure to address issue of negligent hiring and supervision in opposition to summary judgment motion, left the motion virtually unopposed). In this case, however, appellant adequately argued in opposition to the City's summary judgment motion in the trial court that it had presented evidence sufficient to support its claim of negligent retention and supervision and negligent entrustment of a firearm.

**7.** In *Coron*, a jury rendered a verdict against the District of Columbia based on the *respondeat superior* doctrine, in favor of a citizen who was beaten by an off-duty police officer who was in plain clothes at the time. 515

A.2d at 436. The two had passed words when the officer, who had been drinking, almost hit the citizen two times with his private vehicle. *Id.* The citizen kicked at the vehicle. *Id.* at 437. The officer stopped the car, jumped out and severely beat the citizen. *Id.* The officer told the citizen that he would regret running into them and kicking at a policeman's car. *Id.* It was only then that the officer and his companion officer, also in plain clothes, displayed their badges and stated that they had guns and knew how to use them. *Id.* The two officers then went on about their own personal business. *Id.* at 438. Reversing, we noted that the officer's "entire behavior during this incident reflected that of an individual bent on personal vengeance for a perceived personal affront," and we declined to hold District of Columbia liable under such circumstances. *Id.*

that actual or constructive knowledge, failed to adequately supervise the employee." *Giles,* 487 A.2d at 613 (emphasis omitted). Similarly, under Maryland law, the place where the alleged negligent retention and supervision occurred in this case, to establish a cause of action for negligent hiring and retention, a plaintiff must prove:

> that the employer of the individual who committed the allegedly tortious act owed a duty to the plaintiff, that the employer breached that duty, that there was a causal relationship between the harm suffered and the breach of the employer's duty, and that the plaintiff suffered damages.

*Penhollow v. Board of Comm'rs of Cecil County,* 116 Md.App. 265, 695 A.2d 1268, 1284 (1997) (citing *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 501 A.2d 35 (1985)).[8] A discussion of the factual context in which the law has been applied will aid in an analysis of the issues before this court.

In *Fleming, supra,* the plaintiff sued the operators of a grocery store who claimed that the grocery deliveryman employed by the store committed an indecent assault upon her after delivering the groceries and receiving payment. 80 A.2d at 916. The trial court granted judgment for the defendant after the opening statement, concluding that the employer could not be held liable for the employee's actions not within the scope of employment and solely for the employee's own purposes. *Id.* at 917. Although upholding the ruling with respect

to a vicarious liability theory, the court reversed insofar as the claim was based on the direct negligence of the employer in engaging and retaining an unfit employee who caused the injury. *Id.* As to this theory of liability, the court held that an employer has a duty to use reasonable care in the selection of an employee hired to enter the homes of customers, the breach of which will result in liability if injury is proximately caused thereby. *See id.* at 917.

■ *Fleming* differs from this case in that there, the employee's work for the employer brought him into contact with individuals in their homes. Such work afforded the employee "a peculiar opportunity for such misconduct," and an employer who employs such a person, knowing or having reason to know that an employee is likely to commit intentional misconduct, can be held liable for resulting injury. *Fleming, supra,* 80 A.2d at 917 (quoting RESTATEMENT, TORTS § 302, Comment n). In contrast, in the case before us, it is conceded that Thompson did not come into contact with the decedent because of any mission associated with his job as a Mount Rainier police officer. Rather, Thompson, while off-duty, went to decedent's home in the District of Columbia for his own purpose, *i.e.,* to support his roommate, who was resolving a property dispute with his ex-wife in a jurisdiction where Thompson had no police authority. This factual distinction prevents *Fleming* from being supportive of appellant's negligent retention and supervision theories. Absent is any

---

8. In support of their respective positions, the parties have relied upon the law of the District of Columbia. The standard for establishing the cause of action of negligent supervision and retention is certainly no greater in the District of Columbia than in Maryland. Indeed, in *Penhollow, supra,* the Maryland court stated that in light of the county's claim of governmental immunity, the plaintiff had to show an additional element of malicious-

ness in retention and hiring to establish her claim. *See Penhollow,* 695 A.2d at 1284. In light of our determination that plaintiff failed to establish her claim for negligent retention and supervision without any consideration of the additional element imposed in Maryland and the parties' reliance on the District's law, we need not resolve any conflict of law issue in this regard, and apply the law of the District in reviewing these claims.

connection between Thompson's police duties and the purposes he sought to accomplish in the District of Columbia. On these facts, neither a duty nor breach of it, which proximately caused the harm in this case, can be shown to be traceable to the negligence of the City of Mount Rainier.

Appellant also relies on *Morgan, supra,* 692 A.2d at 423 and *Murphy, supra,* 458 A.2d at 63 in support of her negligent retention and supervision theories. In *Morgan,* we reversed the grant of summary judgment on claims of negligent hiring, supervision and training of a drug training counselor employed by the Psychiatric Institute of Washington ("PIW").[9] 692 A.2d at 423. A close relationship started between the counselor and plaintiff while she was a patient at PIW, which led ultimately to a sexual relationship and pregnancy shortly after her discharge from PIW. *Id.* This court concluded that if plaintiff's "stress during pregnancy was proximately caused by PIW's and [the counselor's] negligent mishandling of the transference phenomenon, then [plaintiff] should be able to recover damages for such stress and the consequential cost of related treatment." *Id.* at 426.

*Morgan* presents another situation in which the alleged tortfeasor was placed in contact with the claimant through his employment relationship. There was a nexus between the alleged misuse of the professional relationship by the employee, the alleged negligent acts of the employer, and the resultant injury to the former patient, even though the employee allegedly exploited his position only for his own purposes. In such circumstances, the employer has a duty of care in selecting and training counselors who will be placed in a position of trust with vulnerable patients to avoid the kind of misconduct which allegedly occurred. *See Fleming, supra,* 80 A.2d at 917. In this case, the record shows no similar nexus between the employer's duty to supervise or discharge and Thompson's independent foray into the District of Columbia to assist his friend.

In *Murphy, supra,* we held that in addition to a cause of action against an employer based on *respondeat superior* where its employee shot a trespasser on the employer's property, a direct claim of negligent supervision could be maintained against the employer. 458 A.2d at 62–64. The employer may be directly liable for failing to exercise reasonable care to avoid harm. *Id.* at 63. In such a case, the employer's " 'duty extends even to activities which . . . [sometimes] are outside the scope of employment.' " *Id.* (quoting *International Distrib. Corp. v. American Dist. Tel. Co.,* 186 U.S.App. D.C. 305, 308, 569 F.2d 136, 139 (1977)). We held that since there was some evidence "that the shooting was the outgrowth of a job-related encounter, the motion for summary judgment should not have been granted." *Id.*[10]

9. The trial court had granted summary judgment on the ground that Morgan's injuries were not legally cognizable because she did not suffer a physical injury. *Morgan, supra,* 692 A.2d at 423. On appeal, the court concluded that the counselor's exploitation of the transference phenomenon to achieve a sexual relationship could result in an unwanted physical touching, sufficient, if proven, to meet the physical injury requirement for negligent infliction of emotional distress. *Id.* The transference phenomenon was explained in the trial court "as a patient's emotional reaction to a therapist, generally resulting in the projection of feelings by the patient onto the therapist." *Id.* at 421, n. 13.

10. Specifically, the shooting occurred on the grounds of a facility managed by the Army Distaff Foundation ("Foundation"). *Murphy, supra,* 458 A.2d at 62. The employee had been the gardener there for twenty years, and had as part of his duties "keeping the parking lot free of litter." *Id.* at 63. Young people congregated in the parking lot and engaged in various activities in the course of which they sometimes littered the premises. *Id.* at 62. After the employee approached a young man

Again, the present case is not one in which the shooting arose out of any job-related situation. On the contrary, Thompson's involvement in his roommate's property dispute with his former wife, which led to the shooting, had no connection whatsoever with the City of Mount Rainier and its police department. Unlike *Murphy,* the shooting did not occur on the employer's property and under circumstances that the employer might have foreseen.[11] *See id.* at 64. It was undisputed that at the time of the shooting, Thompson had been off-duty for some time; he was not in uniform; he had no police powers within the District of Columbia where the shooting occurred; and he did not identify himself as a police officer before the shooting.

▆ To summarize briefly, an action for negligent supervision and retention requires proof that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff. *See Murphy, supra,* 458 A.2d at 63–64; *Fleming, supra,* 80 A.2d at 917; *Penhollow, supra,* 695 A.2d at 1284. In this case, appellant failed to establish the essential elements of these causes of action. Appellant contends that the City knew that Officer Thompson had problems serious enough to require the intervention of his supervisor, but it failed to discipline him. Specifically, appellant points out that

Officer Thompson filed false reports and caused dissension among fellow officers and staff. *See* part II. C., *infra.* Appellant's expert expressed the opinion that the City's failure to discipline Thompson led him to believe that his actions were acceptable. Even assuming, as appellant argues, that these alleged acts of misconduct provided adequate grounds for the City to discipline or even terminate Officer Thompson, they are insufficient to establish a duty on the part of the City running to appellant's decedent or a causal nexus between the failure to discipline and Officer Thompson's non-duty related confrontation and shooting of the decedent in a jurisdiction where he was an ordinary citizen. *See District of Columbia v. Coleman,* 667 A.2d 811, 816–17 (D.C.1995). Negligently retaining and supervising Thompson as a police officer in Mount Rainier had little or no connection with his off-duty shooting in a jurisdiction where he had neither the authority to act as a police officer nor made any pretense at the critical time that he was acting pursuant to such authority.[12] *See Bohmfalk v. City of New Orleans,* 628 So.2d 1143, 1147 (La.Ct. App.1993). While the issue of proximate cause is usually for the jury, that is not the case where, as here, there are no facts or circumstances from which a jury can reasonably find that any negligent retention and supervision of Officer Thompson by the City proximately caused the injury and

---

and his friend and asked them to leave the grounds, an argument ensued, culminating in the employee shooting the young man. *Id.* There was evidence that the employee, with the knowledge of his supervisor, frequently walked the grounds and had previously confronted youths there. *Id.* at 64.

**11.** The record indicated that the employee in *Murphy,* with the supervisor's knowledge, roamed the grounds and confronted youth about their presence on the property. 458 A.2d at 64. The court stated that " '[o]ne who engages in an enterprise is under a duty to

anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others.' " *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY (1957), § 213, Comment g, p. 461).

**12.** The fact that Thompson ran the tag to Mrs. Phelan's vehicle through his police department to see whether his friend's name was on the title before he took the car has no material connection to the shooting, which occurred the second time he went to the decedent's home.

death of Mr. Phelan. *See Bragg v. Owens–Corning Fiberglas Corp.*, 734 A.2d 643, 648 (D.C.1999) (citations omitted).

## C. *Negligent Entrustment of a Firearm*

■ There are no cases in this jurisdiction allowing recovery for negligent entrustment of a firearm.[13] Some other jurisdictions, including Maryland, the situs of the entrustment here, have recognized this cause of action. *See, e.g., Neale v. Wright*, 322 Md. 8, 585 A.2d 196, 199 (1991) (negligent entrustment of a motor vehicle); *Bonsignore v. City of New York*, 683 F.2d 635, 637–38 (2d Cir.1982) (negligent entrustment of a revolver); *Johnson v. Patterson*, 570 N.E.2d 93, 96 (Ind.Ct.App. 1991) (negligent entrustment of a shotgun).[14] The elements of this cause of action are:

(1) [t]he making available to another a chattel which the supplier

(2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others

(3) the supplier should expect to be endangered by its use.

*Mackey v. Dorsey*, 104 Md.App. 250, 655 A.2d 1333, 1337 (1995). "If the supplier knows or should know of the entrustee's propensities to use the chattel in an improper or dangerous manner, the entrustor owes a duty to foreseeable parties to withhold the chattel from the entrustee." *Herbert v. Whittle*, 69 Md.App. 273, 517 A.2d 358, 361 (1986). But where the entrustor neither knows nor has any reason to know that there is an inordinate risk of harm in supplying the person with the dangerous weapon, there can be no recovery on this theory even if injury occurs. *Id.* at 361–63.

■ Generally, one "has no duty to prevent the criminal acts of a third party who is not under the defendant's supervision or control unless the criminal conduct was the foreseeable result of the defendant's negligence." *Prather, supra*, 981 S.W.2d at 806 (citations omitted). In other words, "[a] defendant has a duty to protect others from the criminal acts of a third party only if it reasonably appears or should appear to him that the criminal act would be the foreseeable result of his negligence." *Id.* (citations omitted); *see generally District of Columbia v. Cassidy*, 465 A.2d 395, 398 (D.C.1983) (liability may be imposed for reasonably foreseeable results of acts or omissions, including intervening acts of a third party when foreseeable). Thus, our inquiry is whether appellant proffered evidence in the trial court which establishes that the City of Mount Rainier knew or should have known that it was likely that Thompson, if entrusted with a service revolver, would use it in a dangerous manner. *See Prather*, 981 S.W.2d at 806.

■ Appellant contends that the City was on notice "that Officer Thompson was an accident waiting to happen." In support of this claim, appellant cites evidence in Thompson's personnel files indicating various problems. Specifically, there is evidence that the Deputy Chief of Police recommended Thompson's demotion, pointing out that Thompson had displayed "uncontrollable outbursts of rage and lack of control or discipline, disrespect for rank

---

**13.** In *Giles, supra*, 487 A.2d at 611, the plaintiff's son was fatally shot by a gas station attendant with a gun entrusted to the attendant by the station manager. However, the suit was filed against Shell under theories of *respondeat superior* and/or negligent hiring and supervision. *Id.* The attendant was not the employee of appellee Shell; therefore, the court found no master-servant relationship to support a vicarious liability theory. *Id.* at 613.

**14.** The elements for negligent entrustment of a firearm and negligent entrustment of an automobile are the same. *See Prather .v. Brandt*, 981 S.W.2d 801, 806 (Tex.App.1998).

and superior officers." The Deputy Chief of Police also listed two internal investigations of Thompson for filing a false report and destruction of government property, disrespect of superior officers, causing dissension between employees and civilian complaints. Daily observation reports noted Thompson's overbearing nature, and faulted him for the level of force he used during a detention. He received a below average performance evaluation at the end of 1991 for judgment, ability to work without direct supervision and ability to deal with the public and department employees. Thompson also admitted throwing a traffic cone across the office against the door of the Police Chief.[15] Appellant argues that this evidence was sufficient for a jury to conclude that injury to a third party was foreseeable if the City allowed Officer Thompson to continue carrying a weapon.

 Unquestionably, there is substantial evidence that Thompson had many disciplinary problems as a police officer prior to the shooting. The question is whether knowledge of all of these incidents appellant cites supports a claim that the City should have known that Thompson was likely to use his service revolver in a dangerous manner. For only "[i]f the supplier knows or should know of the entrustee's propensities to use the chattel in an improper or dangerous manner, [does] the entrustor owe[] a duty to foreseeable parties to withhold the chattel from the entrustee." *Herbert, supra,* 517 A.2d at 361. We are not persuaded that the incidents identified by appellant, even when taken together, can be deemed to have alerted the police that Officer Thompson might recklessly or deliberately use his weapon

in a private dispute. There was no evidence of conduct by Officer Thompson prior to the fatal shooting in this case which should have alerted the police that Thompson was likely to misuse his gun. There was no evidence that any of his misconduct to that point involved his service revolver, and only a single documented instance of his having used inordinate force during a detention. Nor is there is any contention that Thompson was not proficient in the use of firearms. Even assuming the facts outlined by appellant to be true, they are insufficient as a matter of law to show that the City knew or should have known that Thompson was likely to use his weapon "in a manner involving risk of physical harm to others." *Mackey, supra,* 655 A.2d at 1337. Therefore, we conclude that the trial court did not err in granting summary judgment for appellant on this claim.

## III.

 Finally, appellant argues that the trial court abused its discretion in denying appellant's motion to compel discovery of the police complaint log book and all complaints filed against Officer Thompson. The trial court (Judge Rankin), acting as motions judge, ordered Officer Thompson to produce his statement for *in camera* inspection by the trial judge, who would decide whether it should be produced. The motions judge denied the request to produce the police complaint log book "because not warranted by facts and circumstances of this incident, *i.e.,* irrelevant." We review the trial court's denial of discovery orders for an abuse of discretion. *Kay v. Pick,* 711 A.2d 1251, 1256 (D.C. 1998) (citing *In re Q.D.G.,* 706 A.2d 36 (D.C.1998)) (other citation omitted). "The

15. Appellant also cites an incident which occurred some time after the shooting in this case in which Officer Thompson fired a shot at a patron of a bar in the District of Columbia, after he found him urinating in an alley, and along with a companion, beat and kicked

the man into semi-unconsciousness. Since this incident occurred after the alleged negligent entrustment in this case, it can not be used to show that the City should have foreseen the danger of entrusting a weapon to Thompson *prior to that time.*

trial court has broad discretion to weigh the factors in deciding whether discovery should be compelled." *Id.*

Appellant contends that the trial court failed to apply the proper standard for determining the need for access to the requested documents and that its decision was unreasonable and arbitrary. Appellant argues that the record reflects that there were some complaints against Thompson for which no documentation was provided during discovery. Appellant then refers specifically to "a couple of civilian complaints" mentioned in a letter from the Deputy Chief of Police to the Police Chief in which he outlined a series of problems which supported his recommendation that Officer Thompson's promotion be rescinded. While Officer Thompson testified in deposition that the only complaint he was aware of was made by a lady who complained that he had threatened to arrest her, and appellant deposed the Deputy Chief of Police, appellant contends that documentation of the complaint should have been provided. Further, appellant argues that the City did not properly claim any privilege with respect to the information, nor did it have any right to do so.

The City argues in response, as it did in the trial court, that it disclosed Officer Thompson's entire personnel file during discovery and that appellant had an opportunity to obtain the information from Officer Thompson during deposition. Further, the City argues, to the extent that disclosure of public records was sought, appellant failed to comply with the statutory requirements for securing such records, including a written application to the custodian of records for inspection of same; and to the extent that internal investigation files were sought, a Maryland statute, MD.CODE ANN., art. 27 § 728(b)(5)(iii)(iv) (1957, 1992 Repl.Vol.), prohibits their disclosure.

From the record, it appears that a great deal of information concerning the officer's performance and the officer was disclosed during discovery. This information included, but was not limited to, his personnel file, medical and mental health records, records related to the officer's training, proficiency and usage of weapons, records of his conduct and performance, and documents related to administrative actions. In response to the request for production, the City stated that there were "no documents relating to civilian or departmental review boards because there were no charges preferred nor was Officer Thompson indicted for the actions which give rise to this suit." The City objected to the production of records of its internal investigation because "such documentation constitutes a confidential matter requiring a release signed by Officer Thompson in order to permit disclosure." The City agreed to provide a copy of the District's homicide investigative report as soon as it was received, and subsequently did so.[16] The extent of the City's disclosure of information and documents during discovery, as presented by the parties, was before the motions court when it denied the request for the police complaint log book. On appeal, appellant argues that the trial court abused its discretion in denying the request for the police complaint log book.

We cannot say that the trial court abused its considerable discretion in denying access to the police complaint log book. *See Kay, supra,* 711 A.2d at 1256 (citations omitted). The City argued in opposition to the motion that the request for the log book was overly broad; that information sought concerning complaints against Officer Thompson had already been disclosed through deposition; and that the information sought is privileged and exempt from

---

16. The City had sent a subpoena to obtain a copy of the homicide investigation report.

production. To the extent that the information had been made available through sources other than the police complaint log book, including the officer's personnel file and deposition testimony, it would not be an abuse of discretion to deny its disclosure, particularly given the City's claim of privilege.[17] The trial court concluded that the facts and circumstances did not warrant disclosure and that the information was irrelevant. While there might possibly have been some relevant information in the police complaint log book, the facts and circumstances of the case at that point made disclosure unnecessary. There had been sufficient discovery to obtain all the information as above described. It was within the trial court's discretion to limit disclosure under the circumstances. Therefore, we find no abuse of discretion in the trial court's decision.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*

**17.** *See Robinson v. State,* 354 Md. 287, 730 A.2d 181, 192–93 (1999) (citing MD. CODE ANN., art. 27, § 728 of the Law Enforcement Officers' Bill or Rights (1957, 1992 Repl.Vol.)).